OWBR LLC, d/b/a Outrigger Wailea Resort, a Hawaii limited liability company, Plaintiff,

v.

CLEAR CHANNEL COMMUNICATIONS, INC. d/b/a Urban Network—SFX Multimedia Group, a Texas corporation, SFX Multimedia Group, LLC, d/b/a Urban Network—SFX Multimedia Group, a Delaware limited liability company, et al., Defendants.

No. CIV.02–00142 ACK–KSC.

United States District Court, D. Hawai'i.

Feb. 5, 2003.

Leroy E. Colombe, Chun Kerr Dodd Beaman & Wong, Honolulu, Steven M. Rudner, Rudner Law Offices, Dallas, TX, David R. Teece, Rudner Law Offices, New York, NY, for OWBR LLC, a Hawaii limited liability company dba Outrigger Wailea Resort, plaintiff.

James C. McWhinnie, Mark G. Valencia, Damon Key Leong Kupchak Hastert, Honolulu, for Clear Channel Communications Inc., a Texas corporation dba Urban Network–SFX Multimedia Group, SFX Multimedia Group, LLC, a Delaware limited liability company dba Urban Network–SFX Multimedia Group, John Does 1–5, Doe Partnerships 1–5, Doe Corporations 1–5, defendants.

### *ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT CLEAR CHANNEL COMMUNICATION, INC.'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT SFX MULTIMEDIA GROUP, LLC'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION TO STRIKE PORTIONS OF DEFENDANT SFX MULTIMEDIA GROUP, LLC'S SUMMARY JUDGMENT EVIDENCE*

KAY, District Judge.

### *BACKGROUND*

This lawsuit arises from a contract dispute between Plaintiff OWBR, d.b.a. Outrigger Wailea Resort ("Outrigger") and Defendants Clear Channel Communications ("Clear Channel") and SFX Multimedia Group ("SFX"). On November 19, 2000, Plaintiff entered into an agreement with "Urban Network—SFX Multimedia Group" (the "Agreement"). The Agreement, written by Plaintiff and executed by Plaintiff's Director of Sales and Marketing, Gary Collins, and Miller London, the "Executive Vice–President/President" of "Urban Network—SFX Multimedia Group," provided that Plaintiff would host (at the Outrigger Wailea Resort) Power Jam 2002, a music industry event/conference produced by Defendants and scheduled for February 13–17, 2002.

Pursuant to the contract, the Outrigger held 2,270 sleeping room nights for the convention's attendees. (Pl.'s Concise Statement of Facts ("CSF") Supp. Mot. Summ. J., Ex. A, at 1.) These room nights are broken down by six guest room categories, and the Agreement lists the individual room night rates for each room category, ranging from $235 to $900 per night. (Pl.'s CSF Supp. Mot. Summ. J., Ex. A, at 2.) The Agreement also contains a liquidated damages clause governing any cancellation of the Agreement. This provision provides that should cancellation of the event occur zero to thirty days prior to the group's scheduled arrival, liquidated damages in the amount of one-hundred percent of the "Total Guest Room Revenue," plus applicable taxes, would be due. (Pl.'s CSF Supp. Mot. Summ. J., Ex. A at 4.)

In addition, the Agreement contains a Force Majeure clause, which states the following:

> The parties' performance under this Agreement is subject to acts of God, war, government regulation, terrorism, disaster, strikes (except those involving the Hotel's employees or agents), civil disorder, curtailment of transportation facilities, or any other emergency beyond the parties' control, making it inadvisable, illegal, or impossible to perform their obligations under this Agreement. Either party may cancel this Agreement for any one or more of such reasons upon written notice to the other.

(Pl.'s CSF Supp. Mot. Summ. J., Ex. A, at 9.)

On January 16, 2002, less than thirty days prior to the Power Jam 2002 event, Miller London sent a letter to Mr. Cordeiro cancelling the event. The letter, in pertinent part, states:

> The Urban Network will not be able to move forward with its conference scheduled for February 2002. The events of September 11th coupled with the fragile condition of the U.S. and international consumer economies have resulted in the withdrawal of commitments to this event from many of our sponsors and participants.

(Pl.'s CSF Supp. Mot. Summ. J., Ex. C, at 4.) The letter was signed by Miller London, whose title was listed as:

> Executive Vice President, Urban Entertainment Clear Channel Entertainment, Multimedia The Urban Network

(*Id.*) Defendants assert that the statements in the letter are based on the fact that by December 2001, of the five hundred rooms SFX reserved for Power Jam 2002, only 150 had been booked and only three were secured by a credit card. (Def. SFX's CSF Supp. Mot. Summ. J. ¶ 15.) Additionally, only thirty-eight companies were planning to attend, as opposed to the 102 companies that had participated in the same event the previous year. (*Id.*)

Following the letter, on March 4, 2002, Plaintiff filed this breach of contract action against Clear Channel Communications, Inc. and SFX Multimedia Group, LLC seeking, inter alia, $625,912.65 in liquidated damages. Plaintiff claims that the amount was derived from the amount of Total Guest Room Revenue to be produced under the terms of the contract, plus applicable state and local taxes, minus a previous $10,000 deposit.

Plaintiff and Defendant SFX and Defendant Clear Channel filed separate Motions for Summary Judgment on November 13, 2002. In Plaintiff's Motion for Summary Judgment, Plaintiff seeks summary judgment on three main issues. First, Plaintiff argues that the Agreement was entered into by a division of Clear Channel Communications, Inc. doing business as "Urban Network—SFX Multimedia Group," and thus Clear Channel Communications is liable under the Agreement. Second, Plaintiff argues that Defendants' performance

under the Agreement was not excused by the Agreement's Force Majeure provision in that holding the February 2002 Power Jam event was not "inadvisable." Third, Plaintiff argues that the Agreement's liquidated damages clause is enforceable and thus they should be awarded the damages dictated under this clause.

Defendants, on January 3, 2003, filed a joint Opposition to Plaintiff's Motion for Summary Judgment. In the Opposition, Defendants argue that the Agreement was solely between Plaintiff and SFX, not Clear Channel, as SFX is a subsidiary, not a division, of Clear Channel. Accordingly, they argue, because SFX did not have either actual or apparent authority to act on its behalf, Clear Channel is not liable under the Agreement. Defendants also respond to Plaintiff's motion by arguing that SFX's performance under the agreement was rendered "inadvisable" because of the events of September 11, other acts of terrorism, and their after effects. Furthermore, Defendants contend that the liquidated damages provision in the Agreement is an unenforceable penalty provision and thus Plaintiff is not entitled to damages even if Defendants are found to have breached the Agreement. Plaintiff's Reply to Defendant's Opposition was filed on January 13, 2003.[1]

In Defendants Motions for Summary Judgment, the issues are essentially the same as those addressed in the Plaintiff's Motion for Summary Judgment and the Oppositions thereto. Defendant Clear Channel's Motion for Summary Judgment deals solely with the issue of whether it was a party to the Agreement. Plaintiff's Opposition to this Motion was filed on December 31, 2002, and Clear Channel's Reply was filed on January 10, 2003. SFX's Motion for Summary Judgment argues that SFX's performance under the Agreement was "inadvisable" under the Force Majeure clause and that the liquidated damages clause is an unenforceable penalty provision, and thus Plaintiff is not entitled to any damages if SFX is found to have breached the Agreement. Plaintiff's Opposition to this Motion was filed on December 31, 2002, and SFX's Reply was filed on January 10, 2003. In addition, Defendant Clear Channel, on November 13, 2002, filed a Substantive Joinder in SFX's Motion for Summary Judgment.

Following the filings of the Motions for Summary Judgment, Plaintiff, on December 24, 2002, filed a Motion to Strike SFX's Summary Judgment Evidence. Specifically, Plaintiff seeks to strike portions of the reports of two of SFX's experts, Dr. Lawrence Boyd and Douglas Wheeler, as well as portions of the declarations of Miller London and Carole Carper, as inadmissible opinion evidence and hearsay. Defendant SFX filed its Opposition on January 3, 2003, and Plaintiff filed its Reply on January 13, 2003.

A hearing on these matters was held on January 22, 2003.

### STANDARD OF REVIEW

Summary judgment shall be granted where there is no genuine issue of material

---

1. Under Local Rule 6.1, Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment was actually due on Friday, January 10, 2003. Along with the Reply, Plaintiff filed an Ex Parte Motion to Accept Plaintiff's Reply Filed One Day Late, stating that the Reply was inadvertently filed late due to the fact that Plaintiff's mainland counsel followed Fed R. Civ. P. 6(a) and was unaware of Local Rule 6.1. Because the

Court found that no prejudice would result from accepting the filing on Monday instead of Friday, the Court granted the Ex Parte Motion and considered the Reply in determination of the instant motions.

Plaintiff's Reply to SFX's Opposition to Plaintiff's Motion to Strike Portions of SFX's Summary Judgment Evidence was also filed late, but was likewise accepted by the Court for the reasons stated above.

fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The standard for summary adjudication is the same. *See State of Cal. v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *See id.* at 322, 106 S.Ct. 2548. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citations omitted).

Rather, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *See id.* at 630. At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *See British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.1987) (*citing*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505.

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Indeed, "if the factual context makes the nonmoving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics*, 818 F.2d at 1468 (emphasis in original) (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348). Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *See T.W. Elec. Serv.*, 809 F.2d at 630–31.

## DISCUSSION

### I. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

#### A. Clear Channel's Liability Under the Agreement

■ Plaintiff contends that even though "Clear Channel Communications, Inc." does not appear in the Agreement, it is a responsible party under the Agreement as it was doing business as "Urban Net-

work—SFX Multimedia Group." Defendants on the other hand argue that SFX Multimedia Group, LLC was, and is, a subsidiary of Clear Channel Communications, not a division of Clear Channel as Plaintiff contends. Accordingly, Defendants argue, because parent corporations are not directly liable for the contracts of their subsidiaries, because Clear Channel was not a party to the Agreement, and because SFX had no actual or apparent authority to act on behalf of its parent corporation, Clear Channel is not a party to, and hence not liable under, the Agreement.

In support of its claims, Plaintiff cites the corporate history of the entities involved in this matter. According to Plaintiffs, on February 29, 2000, Defendant Clear Channel announced a deal to acquire SFX Entertainment, Inc. for $4 billion, and the deal was completed in August 2000, three months prior to the signing of the Agreement. (*See* Pl.'s Mem. Supp. Summ. J., at 6; Pl.'s CSF Supp. Mot. Summ. J., Exs. G, H.) In addition, Plaintiff claims that The Urban Network, Inc., a party listed in the Agreement, was "merged out" into another corporation, The Album Network, Inc. (Pl.'s CSF Supp. Mot. Summ. J., Ex. E.) Plaintiff has also provided evidence that SFX Multimedia Group, LLC was listed, in February 2002, as a holding company for "SJS Album Network." (Pl.'s CSF Supp. Mot. Summ. J., Ex. F.) Though not clear from their Motion, it appears that Plaintiff is claiming that SFX Multimedia Group, LLC is the holding company for what used to be The Urban Network.

Additionally, Plaintiff cites an article in Billboard magazine stating that in July 2001 Clear Channel announced that SFX Entertainment would henceforth be known as Clear Channel Entertainment. (Pl.'s CSF Supp. Mot. Summ. J., Ex. I.) According to the article, the SFX divisions formerly known as SFX Music Group, SFX Theatrical Group, and others, including SFX Multimedia, were to be divisions of Clear Channel *Entertainment*. (*Id.*) Plaintiff also offers evidence that in February 2002, a website maintained by Clear Channel Entertainment Inc. at www.sfx.com contained a sublink for "SFX Multimedia" which stated "The Multimedia Group is a diversified division ..." (Pl.'s CSF Supp. Mot. Summ. J., Ex. J.) Furthermore, Plaintiff offers evidence that in October 2002, the Clear Channel Communication website at www.clearchannel.com contained a sublink for "Clear Channel Entertainment Multimedia" stating that Clear Channel Entertainment is "a diversified division" that publishes "Urban Network."

Based on the evidence that Plaintiff has presented, the record is devoid of any proof that SFX Multimedia Group, LLC or The Urban Network are, or ever were, divisions of Defendant Clear Channel Communications, Inc. The only conclusion that Plaintiff's evidence points to is that SFX and The Urban Network are divisions of Clear Channel Entertainment.[2] However, Clear Channel Entertainment is not a party to the lawsuit. Defendants have offered the Declaration of the Assistant General Counsel for Clear Channel Entertainment, in which he states that Clear Channel Communications, Inc., the

---

**2.** The evidence that Plaintiff relies on is of limited value to the Court. The Billboard article was certainly not the official word of a SFX agent or an official document filed with a government entity, such as a Secretary of State. Likewise, there is no proof that the web site statements in any way reflected the actual corporate organization of the entities involved in this matter. Most likely the statements on the web site were not made by an officer or counsel for any of the entities involved. Furthermore, Plaintiff has not shown that any of its agents relied on this evidence in signing the Agreement.

named party in the present suit, is the parent corporation of SFX Entertainment Inc., which does business as Clear Channel Entertainment. (*See* Decl. of Richard Munisteri, dated Dec. 23, 2002, ¶ 3) He also states that SFX Entertainment, Inc., doing business as Clear Channel Entertainment, is the parent corporation of SFX Multimedia Group, LLC, and that SFX Multimedia Group, LLC is not a division of Clear Channel Communications, Inc. (*Id.*) Plaintiff has not provided any evidence to the contrary.

In addition, the Amended Certificate of Formation filed with Delaware's Secretary of State shows that Defendant SFX Multimedia Group, LLC, formerly known as SFX Network Group, LLC, is, and has been, a separate entity from Clear Channel Communications.[3] (Defs.' Mem. Opp. Pl.'s Mot. Summ. J., Ex. F.) Equally important is the fact that Plaintiff has not provided any evidence that SFX Multimedia Group was a division of Clear Channel Communications at the time the Agreement was formed.[4]

Without actual authority to enter into the Agreement on Clear Channel Communication's behalf, the only way that Miller London could have bound Clear Channel under the Agreement is if he had apparent authority to do so. *See Cho Mark Oriental Food v. K & K Int'l,* 73 Haw. 509, 836 P.2d 1057 (1992). Plaintiff, however, does not argue that Mr. London had apparent authority, nor is there any evidence to support the contention. In fact, Miller London states that Clear Channel Communications, Inc. was not a party to the agreement, nor did he ever represent to

anyone affiliated with Plaintiff that Clear Channel was a party to the contract. (Decl. Miller London, ¶¶ 7–10.) Likewise, Mr. Collins, the individual who signed the Agreement on Plaintiff's behalf, states that Clear Channel was not a party to the Agreement and was unaware of any representations that Mr. London was acting on Clear Channel's behalf. (Decl. Gary Collins, ¶¶ 7–13.) Because there is substantial evidence that Plaintiff did not rely on any representations that the Agreement was being executed on behalf of Clear Channel Communications, and no evidence to the contrary, the Court finds that there was no apparent authority to bind Clear Channel Communications.

Accordingly, the Court finds that Clear Channel Communications, Inc., one of the named Defendants in this matter, was not a party to, or responsible for, the Agreement, and thus Plaintiff's Motion for Summary Judgment concerning this issue is DENIED.

### B. Force Majeure Clause

Defendants in this matter argue that SFX's performance under the Agreement was excused by the Force Majeure provision, which states, in pertinent part:

The parties' performance under this Agreement is subject to acts of God, war, government regulation, terrorism, disaster, strikes (except those involving the Hotel's employees or agents), civil disorder, curtailment of transportation facilities, or any other emergency beyond the parties' control, making it inadvisable, illegal, or impossible to perform their obligations under this Agreement.

---

**3.** Plaintiff seems to place great weight on the fact that SFX Multimedia is merely a holding company such that the Power Jam event was truly organized and contracted for Clear Channel Entertainment. Even if this were true, it does not demonstrate that SFX Multimedia is a division, not a subsidiary of, Clear Channel Communications.

**4.** Although SFX's Certificate of Formation (Defs.' Mem. Opp. Pl.'s Mot. Summ. J., Ex. F.) is dated March 31, 2000, prior to Clear Channel Communications acquiring SFX, Plaintiff has not presented any evidence that the SFX entity was ever dissolved. Plaintiff admitted at the hearing that it has no such evidence.

Defendants claim that the September 11, 2001 terrorist acts "severely disrupted travel, decimated the tourism industry, and created a pervasive sense of fear that gripped the country." Based on this effect around the country, Defendants argue, performance under the Agreement—holding the Power Jam 2002 event—was "inadvisable" as referenced in the Force Majeure clause.[5]

Plaintiff counters that the events of September 11, 2001, did not make it "inadvisable" to travel to or to hold events in Hawaii five months after the terrorist attacks. Plaintiff argues that the actual reason that Defendant SFX cancelled the event was because of the economic downturn, which although due in part to September 11, is too attenuated from the events of September 11 to excuse performance under the Agreement's Force Majeure clause.

Under Hawaii law, contract interpretation is a matter of law. *Reed & Martin v. City and County of Honolulu,* 50 Haw. 347, 440 P.2d 526, 527 (1968). It is well settled that contractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech, unless the contract indicates a different meaning. *State Farm Fire and Cas. Co. v. Pacific Rent–All, Inc.* 90 Hawai'i 315, 978 P.2d 753, 762 (1999). In interpreting undefined or disputed contract language, courts should apply an ob-

jective standard, which insures predictability in contracting. *See N.A.P.P. Realty Trust v. CC Enter.,* 147 N.H. 137, 784 A.2d 1166, 1169 (2001) (reasoning that applying a subjective standard of contract interpretation would accomplish nothing more than the restatement of the parties' conflicting positions); *see also Dan Nelson Constr. v. Nodland and Dickson,* 608 N.W.2d 267, 275 (N.D.2000) ("[C]ourts construing changed conditions clauses apply an objective, reasonable person standard, in which a court places itself into the shoes of a 'reasonable and prudent' contractor [to] decide how such a contractor would act in appellant's situation.").

According to Defendants, essential in determining whether Defendant SFX can rely on the Force Majeure clause to excuse its performance is the issue of whether holding the Power Jam 2002 event in February 2002 was "inadvisable" as used in the Agreement's Force Majeure clause.[6] Although there are no common law definitions of "inadvisable" in the context of force majeure clauses, the parties agree that the plain, ordinary meaning of "inadvisable" is: not advisable, inexpedient, or unwise. Webster's Unabridged Dictionary 964 (2001). "Advisable" is defined as "proper to be advised or recommended; desirable or wise, as a course of action." *Id.* "Unwise" is defined as "not wise; foolish; imprudent; lacking in good sense or judgment." *Id.*

---

**5.** In Defendants' pleadings they also refer to other acts of terrorism, such as the attempted acts of "The Shoe Bomber" Robert Reid and the anthrax scare, as well as an outbreak in Hawaii of dengue fever. While the Court does take these other events into consideration, it notes that Miller London cited only the events of September 11th and the "fragile condition of the U.S. and international consumer economies" in his January 16, 2002 letter cancelling Power Jam 2002.

**6.** "Inadvisable" is not defined in the Agreement. Defendants argue that "inadvisable"

should be construed against Plaintiff because Plaintiff drafted the Agreement. However, under Hawaii law, "when the contract has been negotiated between two parties of equal sophistication and equal bargaining power, the rule of interpreting ambiguities against the drafter has been held inapplicable." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 839 P.2d 10, 25 n. 5 (1992). In the instant case, both Plaintiff and SFX are commercially sophisticated parties with equal bargaining power.

■ While the Court agrees that the specific language used in the Force Majeure provision is significant, the term "inadvisable" may not be divorced from the remainder of the clause. Blacks Law Dictionary defines a force majeure clause as a "contractual provision allocating the risk if performance becomes impossible or impracticable as a result of an event or effect that the parties could not have anticipated or controlled." Black's Law Dictionary 657 (7th ed.1999). The clause "defines the scope of unforeseeable events that might excuse nonperformance by a party." *Stand Energy Corp. v. Cinergy Servs., Inc.*, 144 Ohio App.3d 410, 760 N.E.2d 453, 457 (2001). The party who relies on a force majeure clause to excuse performance bears the burden of proving that the event was beyond the party's control and without its fault or negligence.[7] *Stand Energy*, 760 N.E.2d at 457 (citing *Gulf Oil Corp. v. Fed. Energy Regulatory Comm'n*, 706 F.2d 444 (3rd Cir.1983)).

In the absence of statute or case law on the subject, Hawaii courts often look to the Restatement (Second) of Contracts. *See, e.g., Zanakis–Pico v. Cutter Dodge, Inc.*, 98 Hawai'i 309, 47 P.3d 1222, 1237 (2002), *Hough v. Pac. Ins. Co.*, 83 Hawai'i 457, 927 P.2d 858, 869 n. 15 (1996). Although the Restatement of Contracts does not specifically address force majeure clauses, § 261 does provide for discharge of contractual duties by reason of supervening impracticability. *See B.F. Goodrich Co. v. Vinyltech Corp.*, 711 F.Supp. 1513, 1519 (D.Ariz. 1989) (looking to the Restatement of Contracts § 261 to interpret a force majeure provision, and finding that an unexpected drop in market prices was not in the contemplation of the agreement's force majeure provision). Section 261 states:

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Comment b to § 261 states that "mere market shifts or financial inability do not usually effect discharge under the rule stated in this Section."

In defining the impracticability defense, courts have held that a contract becomes impracticable when its performance becomes excessively and unreasonably difficult or expensive. *See CIT Group/Equipment Financing, Inc. v. Taylor*, 1991 U.S. Dist. LEXIS 18171, at 9 (N.D.Cal.) ("[T]he impracticability defense largely pertains to the performance of a physical act."), *Publicker Indus. v. Union Carbide Corp.*, 17 UCC Rep. Serv. 989 (E.D.Pa.1975) (finding that a loss of $5.8 million did not render contract impracticable or excuse performance under the force majeure clause) ("Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance."). In fact, "the unforeseen cost increase that would excuse performance 'must be more than merely onerous or expensive. It must be positively unjust to hold the parties bound.'" *La. Power & Light Co. v. Allegheny Ludlum Indus.*, 517 F.Supp. 1319, 1325 (E.D.La.1981); *see also Iowa Elec. Light & Power Co. v. Atlas Corp.*, 467 F.Supp. 129 (N.D.Iowa 1978) (holding that an increase in seller's costs by 52.2%, resulting in the seller's loss of approximately $2.67 million, failed to con-

---

**7.** The parties agree that the events of September 11, 2001, were a force majeure event under the Clause, however they disagree as to whether September 11 made SFX's performance in February 2002 under the agreement "inadvisable, illegal, or impossible."

stitute commercial impracticability), rev'd on other grounds, 603 F.2d 1301 (8th Cir. 1979).[8]

Similarly, courts interpreting force majeure provisions have held that nonperformance dictated by economic hardship is not enough to fall within a force majeure provision. *See, e.g., Stand Energy,* 760 N.E.2d at 458 (finding that unseasonably hot temperatures resulting in record demand for power and unprecedented high hourly prices for electric power did not excuse, under the force majeure clause, defendant's inability to deliver the power required under the contract). "[M]ere increase in expense does not excuse performance [under a force majeure provision] unless there exists *extreme and unreasonable* difficulty, expense, [or] injury." *Butler v. Nepple,* 54 Cal.2d 589, 6 Cal.Rptr. 767, 354 P.2d 239, 244–45 (1960) (emphasis added) (holding that the fact that compliance with the contract would involve greater expense than anticipated, due to a steel strike, did not excuse performance).

■ Defendants, in their Opposition, focus on how September 11 economically impacted Power Jam 2002. They contend that by December 2001, of the five hundred rooms reserved for Power Jam 2002,

only 150 had been booked and only three were secured by credit cards. (Declaration of Carole I. Carper, filed November 19, 2002, ¶ 19.) In addition, they assert that only thirty-eight companies were planning to attend the event as compared to the 102 companies that participated in Power Jam the year before.[9] (*Id.*) Based on these figures, Defendants argue that "[g]ood business sense and judgment pointed squarely to cancelling the event where SFX could have had to pay out-of-pocket the full non-discounted rates for, at least, 350 rooms." (Defs.' Opp., at 17.) Therefore, they contend, "it was undoubtedly inadvisable for SFX to proceed with Power Jam 2002." (*Id.*) To bolster their claim, Defendants cite claims from their economic experts that performing under the Agreement was "inadvisable." (*See* Expert Reports of Lawrence W. Boyd, Ph.D., and Douglas H. Wheeler, SFX's Mem. Supp. Mot. Summ. J., Exs. K, L.)

■ From an economic standpoint, it was certainly unwise, or *economically* inadvisable, for Defendants to continue with the Power Jam 2002 event. Nonetheless, a force majeure clause does not excuse performance for economic inadvisability, even when the economic conditions are the product of a force majeure event.[10] *See*

---

**8.** Plaintiff also cites to *7200 Scottsdale Road Gen. Partners v. Kuhn Farm Machinery, Inc.,* 184 Ariz. 341, 909 P.2d 408 (1995), involving defenses of impracticability and frustration of purpose, in which the court stated:

> Finally, we consider whether [the defendant] is entitled to relief on the ground that fear of terrorist activities resulted in less than expected attendance, which in turn made the convention uneconomical. Although economic return may be characterized as the "principal purpose" of virtually all commercial contracts, mere economic impracticality is no defense to performance of a contract. Thus, although the Gulf War's effect on the expected level of attendance may have rendered the convention uneconomical, [the defendant] was not on

this ground relieved of its contractual obligation.

*Id.* at 418 (citations omitted).

**9.** It is significant, however, that the Power Jam event had been held in Palm Springs, California in the seven years prior to 2002. The poor registration for the Power Jam 2002 event was likely due, at least in part, to the fact that the event was moved from Palm Springs, which is within driving distance from Los Angeles where a majority of record industry executives are located, to a resort in Maui. Thus both the cost and inconvenience for Power Jam 2002 attendees would be significantly higher than it had been for previous Power Jam events.

**10.** The Court has considered the Declarations of Gary W. Collins, Plaintiff's former employ-

*Butler,* 54 Cal.2d 589, 6 Cal.Rptr. 767, 354 P.2d 239; *see also Stand Energy,* 760 N.E.2d at 458. The Force Majeure clause does not contain language that excuses performance on the basis of poor economic conditions, lower than expected attendance, or withdrawal of commitments from sponsors and participants.[11]

■ Even if economics were not a significant factor in SFX cancelling the Agreement, the Court would still find that SFX could not properly invoke the Force Majeure clause based on the events of September 11. To excuse a party's performance under a force majeure clause ad infinitum when an act of terrorism affects the American populace would render contracts meaningless in the present age, where terrorism could conceivably threaten our nation for the foreseeable future. Certainly had the Power Jam 2002 event been scheduled for the weeks immediately following September 11, Defendants' argument that holding the convention was "inadvisable" would be much stronger. However, five months following September 11, when there was no specific terrorist threat

to air travel to Maui or to Maui itself, Defendants can not escape performance under the Agreement.[12]

The Court recognizes that September 11 was an extreme, unforeseeable occurrence which is of the magnitude to trigger a force majeure clause. Nonetheless, this does not absolve Defendants of the burden of proving that September 11 did in fact render performance under the agreement "inadvisable." The Court finds that, when looked at in the context of the Force Majeure clause, the events of September 11 did not render performance under the agreement in February of the following year objectively inadvisable. Defendants argue that holding the Power Jam 2002 event was "inadvisable" due to people's fear and uncertainty (Defs.' Opp., at 20), however, fear and uncertainty should not be enough to excuse performance under the Agreement. If such were the case, contracting would no longer provide any stability and predictability to commercial transactions.

ee and signatory to the Agreement, and Miller London, Defendant SFX's signatory to the Agreement, and their conclusory opinions that the Force Majeure should excuse SFX under the circumstances surrounding the Power Jam 2002 event.

11. Despite SFX's claims that it did not cancel the Agreement for these reasons, the letter, dated January 16, 2002, that Miller London sent Plaintiff cancelling Power Jam 2002 stated: "The events of September 11th coupled with the fragile conditions of the U.S. and international consumer economies have resulted in the withdrawal of commitments to this event from many of our sponsors and participants."

In addition, the Court notes the significance of Defendant waiting to cancel the Power Jam 2002 event until less than one month before the event was scheduled, and a full four months after September 11. Had cancelling the event been about the security or safety of holding the event due to terrorism and not the

economics of doing so, it is likely that Defendant SFX would not have waited until January to do so.

Moreover, SFX contends that as late as December 2001 it agreed, at Plaintiff's request, to release one hundred rooms per night for Power Jam 2002—evidencing the feeling that no force majeure event had occurred as of that date and that there was no need to seek release of the remaining rooms. *See 7200 Scottsdale Road Gen. Partners v. Kuhn Farm Machinery, Inc.,* 184 Ariz. 341, 909 P.2d 408, 417 (Ariz.Ct.App.1995) ("In late January, after the United States attacked Iraq and when the threat of terrorism was at its highest level, Kuhn implicitly confirmed the convention date by reducing the reserved room block from 190 to 140.").

12. SFX acknowledged at the hearing that it would be "a different story" if the event had been scheduled twelve months after September 11 rather than five months.

Defendant's experts cite extensive evidence that the travel and tourism industries in Hawaii and elsewhere around the country were severely affected in the aftermath of September 11. (*See* Expert Reports of Lawrence W. Boyd, Ph.D., and Douglas H. Wheeler, SFX's Mem. Supp. Mot. Summ. J., Exs. K, L.) Plaintiff does not argue this point, however the effect on these industries does not prove that it was objectively "inadvisable" to travel. It merely demonstrates Americans' subjective feelings about post-September 11 travel, not whether there were objective threats to travel to Maui in February 2002 sufficient to make performance under the Agreement "inadvisable." In fact, according to the Air Transport Association, United States' airlines alone still carried 38.2 million passengers in October 2001 and 38.7 million passengers in November 2001. (Pl.'s CSF Supp. Mot. Summ. J., Ex. M, at 16.) Furthermore, Defendants have not presented evidence that the island of Maui faced any specific terrorist threat.[13]

Based on the case law involving force majeure clauses and impracticability, Defendants have not presented sufficient evidence that terrorism presented travelers in February 2002 with circumstances so "extreme and unreasonable" as to excuse performance under the Agreement.[14]  *See Butler*, 6 Cal.Rptr. 767, 354 P.2d at 244–45. Looking at the Force Majeure clause as a whole, and not merely consisting of the term "inadvisable," the Court finds that Defendant SFX Multimedia Group, LLC's performance under the Agreement was not excused by the Force Majeure provision.

Accordingly, the Court GRANTS Plaintiff's Motion for Summary Judgment with respect to this issue.

## C. Liquidated Damages Provision

The Agreement contains a liquidated damages clause stating that in the event of cancellation of the Agreement by either party, the cancelling party shall pay a cancellation fee based on a schedule set forth in the Agreement. (Pl.'s CSF Supp. Mot. Summ. J., Ex. A at 4.) The fee schedule varies according to how far in advance of the Power Jam 2002 event cancellation was given. Plaintiff argues that because SFX cancelled the Agreement less than thirty days prior to when Power Jam 2002 was to be held, the clause dictates that SFX is liable for 100% of the "Total Guest Room Revenues."[15] (*Id.*) According to Plaintiff's expert's calculations, the total damages under this clause amount to $635,758.90 based on the 2,270 room nights

13. Despite September 11th, in February 2002 a total of 502,376 visitors still traveled to Hawaii. Although this figure is lower than that for February 2001, the total number of visitor days and the average length of stay increased from February 2001. (Pl.'s CSF Supp. Mot. Summ J., Ex. Q.) In addition, statistics compiled by Maui Visitors Bureau show that 17,392 individuals attended conventions or conferences, corporate meetings, and/or incentive meetings in Maui during February 2002. (Pl.'s CSF Supp. Mot. Summ J., Exs. R, S.) The Court notes that, although the government issued an alert regarding domestic terrorism that ran from December 2001 to March 2002, there was no specific warning of danger to the Hawaiian islands and no specific warning regarding air travel.

14. It is worth noting that in response to Plaintiff's requests for documents evidencing or related to travel via a commercial airliner by any Clear Channel and/or SFX manager during the period September 12, 2001, to February 28, 2002, Defendants objected to the request as overly burdensome because: "There are hundreds of Clear Channel and/or SFX managers who routinely travel via commercial airliner." (Pl.'s CSF Supp. Mot. Summ. J., Ex. P, at 2–3.) If travel during this period was as "inadvisable" as Defendants contend, it is unlikely that so many of Defendants' managers would have traveled.

15. As discussed hereinafter, SFX claims it cancelled Power Jam 2002 more than thirty days prior to the event.

that Defendant had contracted for, plus applicable taxes.[16] (Pl.'s CSF Supp. Mot. Summ. J., Ex. T, ¶ 5.) Defendants argue, however, that Plaintiff should not be awarded the $635,758.90 under the liquidated damages clause, as the liquidated damages clause is an unenforceable penalty provision.

■ Under Hawaii law, liquidated damages contained in a contract must be enforced if there is a "reasonable relation" between the liquidated damages and the amount of the party's actual damages. *See Shanghai Inv. Co. v. Alteka Co.*, 92 Hawai'i 482, 993 P.2d 516, 528 (2000), overruled on other grounds, *Blair v. Ing*, 96 Hawai'i 327, 31 P.3d 184 (2001); *see also Dias v. Vanek*, 67 Haw. 114, 679 P.2d 133, 135 (1984). However, a liquidated damages clause that constitutes a penalty will not be enforced. *Kona Hawaiian Assocs. v. Pacific Group*, 680 F.Supp. 1438, 1449 (D.Haw.1988); *see also* Restatement (Second) of Contracts § 356(1) ("A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.").

■ According to the Restatement (Second) of Contracts § 356, two factors combine in determining whether an amount fixed as damages is so unreasonably large as to be a penalty. The first is the reasonableness of the liquidated damages amount

in light of the anticipated or actual loss caused by the breach. Restatement (Second) of Contracts § 356, cmt. a. *See also von Kessel v. Unemori*, 58 P.3d 91, 2002 WL 31630416 (Haw.App.2002) (looking at reasonableness of liquidated damages amount in relation to anticipated damages at time of contracting).[17] The second is difficulty of proof of loss. "The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty, ... the easier it is to show that the amount fixed is reasonable." *Id.*

■ The Court finds that Plaintiff has established that the second factor under the Restatement's reasonableness test weighs in favor of a finding that the liquidated damages clause is enforceable. Plaintiff argues that it is extremely difficult, if not impossible, to determine the actual revenue that would have been derived from the Power Jam 2002 event, and, in turn, the lost profit caused by SFX's breach of contract. Had SFX performed, Plaintiff would have received the profits not only from the rooms occupied, but also from extensive banquet food and beverages as well as numerous ancillary services, such as its spa, gift shop, in-room movies, and recreational programs. (Pl.'s CSF Supp. Mot. Summ. J., ¶ 23; Declaration of Roy Cordeiro, ¶¶ 9–10.) Unlike room

16. There is some question as to what taxes would apply to an amount collected as liquidated damages in this matter. The Agreement's liquidated damages clause refers to both a room tax and the Hawaii General Excise tax. According to Hawaii Revised Statutes ("H.R.S.") § 237D, the room tax, called the Transitory Accommodations Tax ("TAT"), is levied on the "gross receipts ... of the taxpayer received as compensation for the furnishing of transient accommodations." H.R.S. §§ 237D-1,–2.

As there would be no "furnishing of transient accommodations" if Plaintiff received a damages award, it appears from the language

of the statute that Plaintiff would not have to pay the TAT tax to the State of Hawaii on an amount collected as liquidated damages. Thus it follows that Defendant SFX should not have to pay the amount of the TAT tax to Plaintiff as part of a damages award. During the hearing the parties agreed that if Plaintiff is not required to collect the TAT tax that this amount should not be included in any liquidated damages award.

17. At the hearing the parties agreed that the Restatement view, that reasonableness can be measured in relation to either the actual or anticipated loss, governs.

profits, the profits Plaintiff would have received from these other services had SFX performed are difficult to determine. Although Defendants' experts contend that Plaintiff's damages could be achieved by simply multiplying the number of reserved rooms by the anticipated profit from the applicable room rates, less mitigation, they do not factor in the profits the Resort could anticipate from other services that the Power Jam 2002 attendees would have used.

■ With respect to the first factor, however, the Court finds that there is a genuine issue of material fact as to the reasonableness of the liquidated damages amount as compared to the anticipated or actual damages Plaintiff suffered as a result of SFX's breach. Although the liquidated damages provision reasonably relates to the subject matter of the Agreement, the reserved rooms, it is measured by lost revenue rather than by lost profits; with Plaintiff arguing this is reasonable given the additional lost profit from food, beverages, and other services. To prevail, plaintiff must establish a reasonable relationship to anticipated damages, i.e. lost total profits, which includes lost profits per room. Plaintiff acknowledged at the hearing that this is disputed.

Plaintiff's expert Jason Walton asserts that the actual lost profits Plaintiff suffered as a result of SFX's cancellation is at least $410,645, excluding taxes. (Decl. of Jason Walton, ¶ 6, attached to Pl.'s Amended CSF Supp. Mot. Summ. J.) This figure was calculated by multiplying Plaintiff's actual damages associated with each room night during the contracted period, $258.96, by the number of room nights, leading to a figure of $587,839.20 (exclusive of taxes), and then subtracting the amount Plaintiff received from rooms which were resold after the cancellation (i.e. mitigation) and the $10,000 original deposit. (Id.) Plaintiff also adds that the $410,645 figure, while adjusted for the resold rooms, does not take into account the likelihood that the people who used the room nights which appear to have mitigated the loss might reasonably have been expected to use those room nights at another time. (Id. at ¶ 8.) Accordingly, Plaintiff argues, the use of the resold room nights to mitigate the loss only shifts the loss to another time period.[18] (Id.; see also Decl. of Roy Cordeiro, ¶ 7)

Defendants argue that the liquidated damages provision is "unreasonable" in that it is based on the total that Plaintiff would have received per room night, not Plaintiff's profit. Defendant's expert John Candon calculates Plaintiff's lost profits to be between $29,000 and $38,000 (Defs.' Opp. Pl.'s Mot. Summ. J., Ex. M, at 5–6), which is vastly smaller than Plaintiff's figure of $410,645. While Plaintiff concedes that the liquidated damages figure is based on total revenue, it argues that the figure is nonetheless reasonable because, had SFX performed, Plaintiff would have also received the profits from extensive banquet food and beverages as well as numerous ancillary services, such as its spa, gift shop, in-room movies, and recreational programs. (Pl.'s CSF Supp. Mot. Summ.

---

**18.** This argument is based on the fact that the majority of rooms Outrigger was able to resell went to local, transient (i.e.non-group) guests at vastly reduced room rates. Plaintiff argues that because the number of guests drawn from the population of the islands is finite, it is reasonable to assume that the guests who purchased the rooms on such short notice, to take advantage of the discounted rates, would have come to the Outrigger Wailea anyway, at another time during the year. (Decl. of Roy Cordeiro, ¶ 7, attached to Pl.'s Amended CSF Supp. Mot. Summ. J.; Decl. of Jason Walton, ¶ 8, attached to Pl.'s Amended CSF Supp. Mot. Summ. J.)

J., ¶ 23; Declaration of Roy Cordeiro, ¶¶ 9–10.)

With respect to mitigation, Defendants claim that Plaintiff received $320,000 from rebooking the rooms reserved for Power Jam 2002, not $177,000 as Plaintiff claims. (Defs' Opp. Pl.'s Mot. Summ J., Ex. H, at 3.) In response, Plaintiff claims this $320,000 figure is incorrect in that it did not properly take into account what resold rooms should be credited to Defendant. (Pl.'s Reply Mem. Supp. Mot. Summ. J., Ex. C, ¶ 3–5.) Furthermore, the parties disagree as to the lost profits per room night, with Defendants claiming the amount to be $111.13 and Plaintiff claiming the amount to be $258.96.

There also exists a dispute as to rooms that Defendant SFX allegedly released. Defendants claim that at the request of Ms. Cindy Robison, Outrigger's Director of Conference Services, Defendant SFX agreed to release one hundred rooms per night originally reserved for Power Jam 2002 to accommodate a group of Outrigger's longtime clients that regularly book a number of rooms at the same time there every year. (Decl. Carole I. Carper, ¶ 22; Defs.' Opp. Pl.'s Mot. Summ. J., at 28.) However, Plaintiff claims that Ms. Carper explicitly told Cindy Robison not to release any Power Jam 2002 rooms at that time. (Decl. of Cindy Robison, ¶¶ 2–3, attached to Pl.'s Reply Mem. Supp. Mot. Summ. J.; Pl.'s Reply Mem. Supp. Mot. Summ. J., Ex. B.)

In addition, Defendants claim that Carole Carper asked Ms. Robison, in a letter dated January 10, 2002, to "release the Urban Network Power Jam from its block of rooms." [19] (Defs.' Opp. Pl.'s Mot. Summ. J., Ex. K; *see also* Decl. Carole I. Carper, ¶ 23.) While Plaintiff does not argue that it did not receive Ms. Carper's notification, there exists a genuine issue of material fact as to how many, if any, rooms were actually released as a result of this letter,[20] and as to whether this letter cancelled Power Jam 2002, which might trigger a different liquidated damages amount.[21]

---

**19.** At the hearing, neither party was able to explain what Ms. Carper meant by "block of rooms." Defendants intimated that Ms. Carper's statements in the January 10, 2002, letter effectively cancelled the Power Jam 2002 event. However, in the same letter Ms. Carper also states:

> I understand the Outrigger will still sell rooms on behalf of Power Jam at our negotiated commissionable rate.
> We appreciate your cooperation and will continue our efforts at marketing Power Jam in Paradise. Kindly continue your habit of forwarding a copy of the room block. We plan to continue monitoring our participants and seeking additional attendees.
> Looking forward to working with you for a successful "Power Jam in Paradise."

(Defs.' Opp. Pl.'s Mot. Summ. J., Ex. K.)

**20.** Plaintiff's Detail Reservation Listing as of January 17, 2002, (Defs.' Opp. Pl.'s Mot. Summ. J., Ex. L.), includes the text "Release: 1/11/02," possibly reflecting that Plaintiff released 191 rooms following Ms. Carper's letter. However, the document is not clear nor could the parties explain the exhibit at the hearing.

**21.** Plaintiff argued at the hearing that the issue of whether or not any rooms were released prior to Mr. London cancelling the event is irrelevant in that once the event was cancelled, the liquidated damages provision applied in full. At this time, however, the issues of fact surrounding the alleged released rooms do appear relevant. The Court questions whether it would be reasonable to enforce the liquidated damages clause based on a calculation of five hundred rooms if one hundred or more of those rooms had been released at Plaintiff's request. Moreover, based on the language in the Agreement, it is not clear how released rooms prior to cancellation effect the interplay between the Attrition (Agreement, Section VII) and the Liquidated Damages (Agreement, Section VIII) clauses.

Based on the conflicting evidence concerning the amount of anticipated and actual damages Plaintiff suffered as a result of Defendant SFX's breach, the Court finds that there is a genuine issue of material fact concerning the figures essential to the Court's determination of whether the amount fixed by the liquidated damages clause is reasonable. In addition, genuine issues of fact concerning whether rooms were released also underlie this determination. Thus, the Court DENIES Plaintiff's motion for summary judgment as to the damages issue with respect to the first factor of the Restatement (Second) of Contract's reasonableness test.

The Court does, however, find that Plaintiff has established that the second factor under the Restatement's reasonableness test weighs in favor of a finding that the liquidated damages clause is enforceable. Accordingly, the Court GRANTS Plaintiff's Motion for Summary Judgment as to the issue of damages with respect to the second prong of the Restatement's reasonableness test.

## II. DEFENDANT CLEAR CHANNEL'S MOTION FOR SUMMARY JUDGMENT

Defendant Clear Channel Communications, Inc. argues that it is not, and never has been, a party to the Agreement, nor is there any evidence indicating Miller London executed the Agreement on behalf of Clear Channel or that Plaintiff relied on any representation regarding Clear Channel before the Agreement was executed. Plaintiff argues, as it did in its Motion for Summary Judgment, that SFX Multimedia and The Urban Network were divisions of Clear Channel Communications at the time the contract was executed, and thus Clear Channel is a responsible party under the agreement.

Based on the reasons stated above in the Court's discussion of Plaintiff's Motion for Summary Judgment, the Court finds that the entity under which the agreement was executed, "Urban Network—SFX Multimedia," was not a division, but rather a subsidiary of Clear Channel Communications. Furthermore, the Court finds that Miller London, SFX's signatory to the Agreement, did not have the actual or apparent authority to bind Clear Channel Communications, Inc., and thus Clear Channel Communications, Inc. was not a party to the Agreement.

Accordingly, the Court GRANTS Defendant Clear Channel Communication, Inc.'s Motion for Summary Judgment.

## III. SFX MULTIMEDIA GROUP, LLC'S MOTION FOR SUMMARY JUDGMENT

### A. Force Majeure Clause

As the Court has granted Summary Judgment for Plaintiff on the issue of whether the Force Majeure clause excuses Defendant SFX's performance under the Agreement, the Court DENIES Defendant SFX Multimedia Group, LLC's Motion for Summary Judgment on the same issue.

### B. Liquidated Damages Provision

Based on the reasons stated in the Court's discussion of the liquidated damages clause issue in Plaintiff's Motion for Summary Judgment, the Court DENIES Defendant SFX Multimedia Group, LLC's Motion for Summary Judgment as to the same issue.

## IV. PLAINTIFF'S MOTION TO STRIKE PORTIONS OF DEFENDANT SFX MULTIMEDIA GROUP, LLC'S SUMMARY JUDGMENT EVIDENCE

Federal Rule of Evidence 56(e), pertaining to summary judgment, provides in

pertinent part: Supporting and opposing affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Where an affidavit does not meet this standard, it is subject to a motion to strike. *McSpadden v. Mullins,* 456 F.2d 428, 430 (8th Cir.1972) (citations omitted). In granting summary judgment, the court may consider any evidence that would be admissible at trial. *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.,* 301 F.3d 610, 613 (7th Cir.2002). "The evidence need not be admissible in form (for example, affidavits are not normally admissible at trial), but it must be admissible in content." *Id.*

Plaintiff seeks to exclude portions of SFX's summary judgment evidence. In particular, Plaintiff seeks to exclude statements from the expert report of Lawrence W. Boyd, the expert report of Douglas H. Wheeler, the Declaration of Carole Carper, and the Declaration of Miller London. These statements all pertain to the issue of whether the Agreement's Force Majeure clause excused SFX's breach of contract. As the Court has granted Plaintiff's Motion for Summary Judgment with respect to this issue, the Motion to Strike is moot. Even taking into account the statements Plaintiff seeks to strike, Defendants' evidence was insufficient to warrant a finding that the Force Majeure clause excused SFX's performance under the Agreement. Thus, the Court's decision as to summary judgment is not affected by the outcome of Plaintiff's Motion to Strike.

Accordingly, the Court DENIES Plaintiff's Motion to Strike as moot. However, even if the motion were not moot, it would be denied for the following reasons.

### A. Expert Report of Lawrence W. Boyd

Plaintiff seeks to exclude eight statements in Dr. Boyd's expert report that pertain to his opinions on how travel to Hawaii was affected in the months following September 11, 2001 as well as his opinions on whether holding the Power Jam 2002 event was "inadvisable" based on the economic after-effects of September 11. Plaintiff argues that such statements are inadmissable in that they lack foundation and are conclusory and speculative.

Federal Rule of Evidence 702 states that a witness qualified as an expert may testify "in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Unlike lay witnesses, expert witnesses do not need to have personal knowledge of the underlying facts. *See* Fed.R.Evid. 703. They may testify to opinions based on the facts perceived by or made known to the expert at or before the hearing. *Id.; see Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469.

Dr. Boyd's statements are admissible in that they are not merely based on his "economic model" as Plaintiff contends. His opinion is based on numerous news reports, various Hawaii visitor, hotel occupancy, and convention data from the State of Hawaii Department of Business and Economic Development and the Center for Labor Education and Research, the Declaration of Miller London, and the Declaration of Carole Carper. Based on the information provided, Dr. Boyd's opinions that Plaintiff seeks to strike do have an adequate foundation and are thus appropriate summary judgment evidence. *See* Fed R. Evid. 702, 703. Moreover, Dr. Boyd's ex-

perience and education in the fields of economics and economic behavior provide him with a sufficient background to form his expert opinions. *See* Fed R. Evid. 702, 703.

### B. Expert Report of Douglas H. Wheeler

Plaintiff also seeks to strike six statements from the expert report of Mr. Wheeler. These statements pertain to the effects of September 11 on the travel and tourism industry, the effects of September 11 on his clients, and his opinions as to whether it was reasonable and advisable for SFX to cancel the Power Jam 2002 event. Plaintiff objects to the statements on the grounds that they are speculative and lack foundation. For the reasons stated above with regard to Dr. Boyd's statements, Mr. Wheeler's testimony is admissible expert testimony. Based on his knowledge and experience, as well as the information he considered, Mr. Wheeler's statements are not inadmissable speculative statements. Furthermore, Plaintiff's assertion that the statements lack foundation as the record contains no specific facts concerning the circumstances surrounding the cancellation of Mr. Wheeler's client's events is without merit.

### C. Declaration of Carole Carper

Plaintiff seeks to strike the following statement from the Declaration of Carole Carper as inadmissable hearsay:

21. Based on my firsthand interaction with potential Power Jam 2002 attendees, I believe many potential participants were afraid to fly to Hawai'i because of the terrorist attacks of September 11, 2001, and the after effects of those attacks.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Fed.R.Evid. 801(c), and is inadmissable un-

less it is defined as non-hearsay under Fed.R.Evid. 801(d) or falls within a hearsay exception under Fed R. Evid. 803, 804, or 807. *Orr v. Bank of Am.*, 285 F.3d 764, 778 (9th Cir.2002) (citing Fed.R.Evid. 802).

Although Carper's statement does not include the direct statements of another, it is based on statements made by individuals other than Carper, and is thus hearsay. However, Fed.R.Evid. 803(3) provides that hearsay is admissible if the statement is of "the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." As Carper's statement listed above is based on the then existing state of mind and emotion of the potential Power Jam 2002 attendees, her statement is admissible hearsay.

In addition, Plaintiff seeks to strike the statement to the extent that it is based not on what others told Carper but on her perception of events. As Carole Carper has handled the travel arrangements for Power Jam since 1989, she is certainly competent to testify about Power jam attendance, and her opinion is based on a common sense perception of events.

### D. Declaration of Miller London

Plaintiff seeks to strike the following statements from the Declaration of Miller London:

16. Unfortunately, the September 11, 2001, terrorist attacks and their after effects severely impacted Power Jam 2002 ...

17. Because of the extremely low number of reservations and projected participation in Power Jam 2002 resulting from the September 11th terrorist attacks and their effects, SFX's performance under the Letter Agreement was inadvisable

18. As a result of the September 11th terrorist attacks and their after effects, I understand and believe many other SFX events were cancelled or rescheduled.

Plaintiff objects to these statements on the grounds that they are based on the "unfounded assertion" that the events of September 11 made performance under the agreement inadvisable, that they are inadmissible hearsay, that they are conclusory and speculative, and not supported by specific facts in the record.

To the extent that the statements listed above are hearsay, they are admissible under Fed R. Evid 803(3) for the same reasons discussed with regard to Carole Carper's declaration.

With respect to Plaintiff's other objections, lay witnesses can provide testimony in the form of opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701. In addition, opinion or inference testimony otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. Fed R. Evid. 704.

Accordingly, the fact that the Court in the Motions for Summary Judgment ultimately decided the issue of whether the Force Majeure clause excused SFX's performance does not mean that Mr. London could not opine on the issue of inadvisability. As Mr. London is the president of The Urban Network, he would certainly have the knowledge necessary to make the statements listed above.

### CONCLUSION

The Court GRANTS in part and DENIES in part Plaintiff's Motion for Summary Judgment. The Court finds that the entity under which the agreement was executed, "Urban Network—SFX Multimedia," was not a division of Clear Channel Communications, Inc., but rather a subsidiary of Clear Channel Entertainment, Inc. at the time the Agreement was executed. In addition, the Court also finds that there is no evidence indicating that Miller London executed the Agreement on behalf of Clear Channel Communications or that Plaintiff relied on any representation regarding Clear Channel Communications before the Agreement was executed. Thus Clear Channel Communications, Inc. was not a party to the Agreement, and Plaintiff's Motion for summary judgment is denied with respect to this issue.

The Court also finds that in looking at the Force Majeure provision as a whole, and interpreting "inadvisable" by an objective standard in the context of the provision, that SFX Multimedia Group's performance under the Agreement was not excused by the Force Majeure clause. Thus the Court grants Plaintiff's Motion for Summary Judgment with respect to the issue of the Force Majeure clause.

With respect to damages, the Court finds that there are genuine issues of material fact underlying the Court's determination of the reasonableness of the liquidated damages provision in terms of the anticipated and actual damages. In addition, genuine issues of fact concerning the allegedly released rooms also underlie the determination of the liquidated damages clause's enforceability. However, the Court finds that Plaintiff has established that Plaintiff's difficulty in proving its loss weighs in favor of a finding that the liquidated damages clause is enforceable. Thus the Court grants in part and denies in part Plaintiff's Motion for Summary Judgment with respect to damages.

For the aforementioned reasons, the Court GRANTS Defendant Clear Channel

Communication's Motion for Summary Judgment.

For the aforementioned reasons, the Court DENIES Defendant SFX Multimedia Group's Motion for Summary Judgment both as to the issue of the Force Majeure provision and the issue of damages.

The Court DENIES Plaintiff's Motion to Strike Portions of Defendant SFX Multimedia Group's Summary Judgment Evidence. As the Court has granted Plaintiff's Motion for Summary Judgment with respect to the Force Majeure issue, the Motion to Strike is moot. However, in the alternative, if the motion were not moot, it would be denied because the statements Plaintiff seeks to exclude were admissible under the Federal Rules of Evidence.

IT IS SO ORDERED.