CHUCK MEYER, APPELLEE, v. SANDHILLS BEEF, INC., A NEBRASKA CORPORATION, APPELLANT.

318 N.W.2d 863

Filed April 30, 1982. No. 43942.

Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, for appellant.

Raymond, Olsen, Coll & Ediger, P.C., for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

CLINTON, J.

This is an action by the plaintiff Meyer against the defendant, Sandhills Beef, Inc., to recover a balance alleged to be owed on the following described written contract: "This agreement dated November 13, 1979 states that Chuck Meyers will harvest and deliver all corn off the Francis DeVear Farm, located 35 miles Northeast of Scottsbluff on hiway 71, to Sand Hills Beef of Mitchell, Nebraska. The DeVear Farm has 1260 acres of corn under Pivot Sprinklers. "All corn will be delivered by 12-1-79. Sand Hills Beef will pasture the corn stalks and approximately 600 acres of grass. Meyers will put down 2 submersible pumps in the present irrigation wells and provide electricity. Sand Hills Beef will provide the stock tanks and fencing.

"For all corn and pasture Sand Hills Beef will pay Meyers $185,000.00 total. $100,000.00 on 11-13-79 and the balance when all corn is delivered to Sand Hills Beef.

"Meyers guarantees all crops are lien free.

"Sand Hills Beef_/s/ by Darwin Heggem_
_/s/ Chuck Meyer_ "

The plaintiff's petition alleged the making of the

contract and plaintiff's substantial performance of the contract's conditions. It further alleged that the acres of corn planted on the DeVries (erroneously referred to as DeVear in the contract) farm numbered 1,132 acres, not the 1,260 acres stated in the contract, and that, accordingly, the defendant was entitled to a credit of $18,794.24; that all of the corn from the DeVries farm had been delivered; that 20 acres of corn could not be combined because of snow in the field; that Sandhills refused to pasture the corn stubble and the grassland; and that the plaintiff mitigated his damages by selling a portion of the corn stubble for the sum of $5,000. He then prayed for judgment in the amount of $61,205.76.

Sandhills in its answer admitted execution of the contract; the corn acreage of 1,132 acres rather than the 1,260; payment of the $100,000 downpayment; and Meyer's delivery to Sandhills of 1,145.085 tons of corn which had a market value of only $93,896.97. Sandhills further alleged that Meyer breached the contract in several respects, only four of which are necessary to notice on this appeal: "a) By tendering an amount of corn unreasonably disproportionate to the stated estimate of 66 bushels per acre;

"b) By failing to deliver a quantity of corn reasonably within the expectations of the parties;

. . . .
"g) Failure to deliver the corn free of liens; and

. . . .
"Plaintiff failed to conduct his business in good faith and according to commercial standards of fair dealing in the trade and his output failed to approximate a reasonably foreseeable figure." Included in Sandhills' answer was a counterclaim which alleged that Sandhills paid the $100,000 "under the supposition the fields would yield an amount of corn reasonably proportionate to the stated figure of 66 bushels per acre for 1,260 acres." It asked for judgment on the counterclaim in the amount of $6,103.03 and pre-

judgment interest in the amount of $17,240.

The case was tried before the district judge without a jury, and on September 3, 1980, both parties rested. The court then directed the parties to file briefs on September 15 and set oral argument for September 17. On September 10, 1980, Sandhills filed a motion asking that it be allowed to amend its answer to the petition to allege the following defenses, to conform the pleading to the proof, viz, fraud, breach of express warranty, and mutual mistake. All of these defenses were founded upon the claim that before the contract was made, the plaintiff had represented that some of the corn already harvested had averaged 66 bushels per acre and that the harvested corn was the poorest in the field.

The trial judge, on September 17, overruled the motion to amend. The court then at a later date made findings of fact and conclusions of law and rendered judgment against the defendant in the sum of $64,057.20 plus costs, with credit to be given for satisfying a judgment for a thresher's lien.

Among its factual findings the court found that during the negotiations leading up to the contract and determination of the contract price, "Defendant asked to buy the corn per hundred weight—plaintiff refused. Plaintiff insisted on a sale in gross for *all* corn. They negoiated [sic] price and ultimately Heggem [defendant's agent] prepared," and the parties executed, the contract which we have previously set forth. The court also found: "During discussions leading to the sale, plaintiff estimated a yield of 66 bushel per acre but expressly refused to guarantee any bushel-yield, either per acre or in total."

The court found that the contract was not an "output" contract as contended by Sandhills and gave the reasons for that conclusion, stating: "The 'all' is definite because it is in existence, identifiable, inspected, seen and measureable.

"The problem lies in the fact that the measuring is not done by output or production. The measuring was done by estimating and weighing." The court further found that plaintiff was not a producer.

The court rendered the following conclusions of law: "1. Quantity is not measured by either the output or production of the seller.

"2. Exhibit #1 is a full, final and complete expression of the agreement of the parties.

"3. Plaintiff has substantially performed its obligations under the contract except as to a portion regarding mistaken total acreage and 20 acres unharvested because of weather.

"4. Defendant has breached the contract by a refusal to pay the balance due less mitigation and credits. The amount due is $64,057.20. Upon satisfaction of a judgment in Hohnstein [sic] v. Sandhills Beef, Case #27895, defendants should receive additional credit of $17,240.00 and may receive credit on this judgment by demonstrating a payment thereof." (The judgment in #27895 relates to a thresher's lien in a case which was pending on appeal at the time of trial of this action.)

Sandhills appeals to this court. The assignments of error made by Sandhills raise the following issues: (1) Whether the contract was an "output" contract within the meaning of Neb. U.C.C. § 2-306(1) (Reissue 1980), and if it was, whether there was a breach of "good faith" in its performance and whether the quantity tendered was unreasonably disproportionate to a stated estimate; and (2) Whether the court erred in refusing to permit Sandhills to amend the pleadings to conform to the proof. We find the two assignments are without merit and affirm the trial court's judgment.

Section 2-306(1) provides: "A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except

that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded." An output contract is not further defined by the Uniform Commercial Code, nor does the case law define the term other than as may be inferred from the facts in the decided cases. However, both the decided cases and the commentary on § 2-306(1) are helpful in arriving at a definition of the term which confirms that which the language of the statute conveys.

The commentary accompanying § 2-306(1) includes the following: "1. Subsection (1) of this section, in regard to output and requirements, applies to this specific problem the general approach of this act which requires the reading of commercial background and intent into the language of any agreement and demands good faith in the performance of that agreement. It applies to such contracts of nonproducing establishments such as dealers or distributors as well as to manufacturing concerns.

"2. Under this article, a contract for output or requirements is not too indefinite since it is held to mean the actual good faith output or requirements of the particular party. Nor does such a contract lack mutuality of obligation since, under this section, the party who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a reasonably foreseeable figure. Reasonable elasticity in the requirements is expressly envisaged by this section and good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance. A shut down by a requirements buyer for lack of orders might be permissible when a shut down merely to curtail losses

would not. The essential test is whether the party is acting in good faith. Similarly, a sudden expansion of the plant by which requirements are to be measured would not be included within the scope of the contract as made but normal expansion undertaken in good faith would be within the scope of this section."

It is clear from the language of § 2-306(1) and the commentary that an output contract is one in which the actual quantity of goods subject to the sale or purchase is indefinite. The quantity is determined either by the output of the seller or the requirements of the buyer. Section 2-306(1) is referred to by the text writers as a gap filler. White & Summers, Uniform Commercial Code § 3-8 (2d ed. 1980). This code section gives validity to the contract despite the uncertainty as to quantity, while at the same time making certain equitable exceptions. The nature of an output contract and of the exceptions is determined by examining the language of the statute. Output means "such actual output . . . as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded." § 2-306(1).

It is the good faith and stated estimate requirements upon which Sandhills relies for its defense in this case. The term "may occur in good faith" clearly pertains to performance of the contract and to production which is at least to some extent within the seller-producer's control. Sandhills also relies upon Neb. U.C.C. § 1-203 (Reissue 1980), which provides: "Every contract or duty within this act imposes an obligation of good faith in its performance or enforcement."

A common characteristic of output and requirements contracts is that they refer to future output and future requirements. *R. L. Kimsey Cotton Co.*

*v. Ferguson*, 233 Ga. 962, 214 S.E.2d 360 (1975); *Tennell v. Esteve Cotton Co.*, 546 S.W.2d 346 (Tex. Civ. App. 1976); *Harris v. Hine*, 232 Ga. 183, 205 S.E.2d 847 (1974); *Columbia Gas Transmission v. Larry H. Wright, Inc.*, 443 F. Supp. 14 (S.D. Ohio 1977). Because quantity is uncertain, such contracts fix a price based upon units rather than a total price for the entire purchase.

In this case the evidence shows the crop here purchased was a matured crop of a stated number of acres and the price to be paid for that crop as well as the pasturage was a fixed price for the whole quantity to be harvested and delivered by the seller. That price was $185,000 and was arrived at by negotiations between the parties after the seller initially asked for $230,000 and the buyer offered $130,000. The evidence showed that an agent of the buyer inspected the corn in the field, took a number of ears as samples, tested them for weight and moisture content, and found the moisture was high and the weight was substantially lighter than normal. Another agent of Sandhills, Heggem, who signed the contract, made his own estimate of total production and the value of the cornstalks and other pasturage. The court properly found that the contract was not an output contract.

Reliance by Sandhills upon § 1-203 is also misplaced. That section refers to performance of the contract in good faith. There is no evidence that would support a finding that the plaintiff did not perform in good faith. It is plain Sandhills' present complaints relate not to lack of good faith in performance, but to matters which preceded the making of the contract.

We now consider whether the court erred in not permitting amendment of Sandhills' answer to allege the affirmative defenses we earlier mentioned. Neb. Rev. Stat. § 25-852 (Reissue 1979) provides that the court may, either before or after judgment, per-

mit certain amendments, and then goes on to read, "or, when the amendment does not change substantially the claim or defense, by conforming the pleading or proceeding to the facts proved." Under § 25-852, a pleading may be amended in the furtherance of justice, to conform to the proof, if the proposed amendment does not change substantially the claim or defense. *Stungis v. Union Packing Co. of Omaha, Inc.,* 196 Neb. 126, 241 N.W.2d 660 (1976); *Johnson v. American Smelting & Refining Co.,* 80 Neb. 250, 114 N.W. 144 (1907); *Scott v. Spencer,* 44 Neb. 93, 62 N.W. 312 (1895).

It is clear from the portion of Sandhills' answer that we have earlier quoted and from the specific findings of the trial court, the latter all being clearly supported by the evidence, that Sandhills was relying upon §§ 2-306(1) and 1-203 as the basis for its defense and that the proposed amendments would substantially change the defense. It is evident that if plaintiff had known at trial that the defense of warranty, fraud, and mistake was at issue, an entirely different approach would need to have been taken in objection to evidence and interrogation of witnesses, both on direct and cross-examination. The trial court did not err in denying Sandhills' motion to amend because the requested amendments would have substantially changed the defense.

AFFIRMED.