STAND ENERGY CORPORATION, Appellant and Cross–Appellee,

v.

CINERGY SERVICES, INC., Appellee and Cross–Appellant;
The Power Company of America, L.P. et al.

[Cite as *Stand Energy Corp. v. Cinergy Serv., Inc.* (2001), 144 Ohio App.3d 410.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–000278 and C–000331.

Decided June 29, 2001.

*Rendigs, Fry, Kiely & Dennis, LLP, Leonard A. Weakley, Jr.,* and *James J. Englert,* for appellant and cross-appellee.

*Wayne A. Harris; Dinsmore & Shohl LLP, Mark A. Vander Laan, Neal D. Baker* and *Timothy S. Mangan,* for appellee and cross-appellant.

*Per Curiam.*

This litigation stems from the failure of plaintiff-appellant/cross-appellee Stand Energy Corporation ("Stand Energy") to deliver specified quantities of bulk electric power to defendant-appellee/cross-appellant Cinergy Services, Inc. ("Cinergy"). Stand Energy and Cinergy each appeal from the trial court's judgment, reached after a bench trial, declaring the rights of these energy distribution and marketing companies and awarding damages in regard to the sale of bulk electric power pursuant to three agreements: a five megawatt ("MW") contract, a one-hundred MW contract, and a letter of intent.

Because competent, credible evidence supports the trial court's findings that Stand Energy had breached the two contracts to provide power or to pay liquidated damages, despite a claim of *force majeure,* and that the letter of intent was not a binding and enforceable contract, we affirm the legal conclusions of the trial court. But because the trial court erroneously failed to journalize one award of damages between Stand Energy and Cinergy, we must vacate the judgment for damages only and remand this cause.

## FACTS

With the advent of deregulation in the electric power industry, companies without generating capability were permitted to buy and sell electric power as "power marketers" or brokers. Stand Energy is one such broker, buying and selling power for profit by "hedging" or speculating on changes in the market price of electricity. While Cinergy generates power for consumers, it also has a division that, as Stand Energy does, trades electrical power as a commodity.

On April 1, 1995, Stand Energy and Cinergy entered into an umbrella contract known as an "Interchange Agreement," which set forth the terms and conditions relating to the purchase and sale of bulk electric power between the parties. The Interchange Agreement contained a *force majeure* provision stating that one party would not be liable for damages to the other for a failure to perform resulting from the occurrence of "any cause or event not reasonably within the control of the Party claiming Force Majeure, and not attributable solely to such Party's neglect, including but not limited to * * * act of God or the public enemies, breakage or accident to machinery, transmission lines * * *."

On August 21, 1997, the parties entered into a contract in which Stand Energy agreed to deliver one-hundred MW "blocks" of electric power to Cinergy throughout 1998 at a price of $23.90 per megawatt hour ("MWh"). This contract incorporated the terms of the Interchange Agreement. It further stated that Stand Energy could perform in two ways under the contract. It could deliver the power, or "where such failure was not due to reasons of Force Majeure," it could pay Cinergy's cost to replace the power from the market minus the contract price. Stand Energy reliably delivered power from January 1, 1998 to June 25, 1998.

On June 23, 1998, Stand Energy found that two of its suppliers were not going to supply the power needed to satisfy Stand Energy's contractual obligations. For two days, Stand Energy itself purchased replacement power at a cost of $600 per MWh. On two subsequent days in June 1998, Stand Energy could not deliver all or part of its contractual power requirements. Cinergy incurred costs to replace the undelivered power. From July 14 through July 21, Stand Energy again could deliver only portions of the power required by the contract. Cinergy again incurred costs to replace the power.

Stand Energy filed this suit on July 15, 1998, seeking, *inter alia,* a declaration that it was not liable for failing to provide electric power during June and July 1998 due to *force majeure.* Stand Energy informed Cinergy of the suit during a July 20, 1998 telephone conference call. Stand Energy's counsel informed Cinergy that it could not afford to pay and was not obligated to pay the liquidated damages specified in the contract, now totaling over $1.1 million, due to *force majeure.* Stand Energy's controller admitted that the balance of payments was over $400,000 in favor of Cinergy at the time of the conference call. Stand Energy nonetheless informed Cinergy that it expected payment for the power it had already delivered in June. After the conference call, Stand Energy's president declared that it would deliver no more power in 1998 under the one-hundred MW contract.

Stand Energy's refusal to provide power is comprehensible only in light of two other written documents then existing between the parties, an option contract

and a letter of intent. In October 1995, the parties had entered into a ten-year options contract—the five MW contract. Under the contract, Stand Energy had the right to receive five to eight MW of electric power from Cinergy at a set price. The contract further allowed Stand Energy to receive the power from Cinergy with only ten minutes' notice—an unusual and valuable provision in a power contract.

On four days in June 1998, Stand Energy exercised the option and Cinergy provided power. Cinergy billed Stand Energy $20,522.25 for the power in a June 16, 1998 invoice. Payment was due on July 28, 1998.

After filing the suit claiming *force majeure* under the one-hundred MW contract, Stand Energy again exercised its option on the day of the telephone conference call, July 20, and again on July 21. Cinergy provided the power and invoiced Stand Energy on August 26, 1998. Stand Energy did not tender payment on either invoice.

In 1997, Stand Energy and Cinergy had also signed a third document identified as a "letter of intent for on-peak power supply to Cinergy." The power was to be supplied ultimately to one of Cinergy's commercial customers. The first paragraph of the four-page letter of intent provided that "Stand Energy shall sell power" and " * * *shall deliver to Cinergy * * * 200 MW * * * " for three years beginning in 2000. The letter of intent contained numerous detailed provisions, including ones for the purchase price of the power at approximately $25 per MWh, *force majeure,* requirements of confidentiality, and assignment.

The letter of intent also stated, "This proposal is dated July 18, 1997." It contained four contingencies, or conditions precedent, to be satisfied prior to execution of a formal agreement, including (1) execution of the letter of intent, (2) negotiation, execution, and delivery of a mutually acceptable agreement for power supply, (3) acquisition of regulatory approval, and (4) an arrangement for transmission of the power. The letter of intent was signed by officers of Stand Energy and Cinergy.

In January 1998, Cinergy contacted Stand Energy to prepare a confirmation letter for the formal agreement. Stand Energy, noting the substantial rise in the price of power, indicated that the agreement needed to be renegotiated. On May 10, 1998, Stand Energy stated that it was not bound by the letter of intent. Then, during discussion over the one-hundred MW and the five MW contracts on July 20, 1998, Cinergy's counsel stated that Stand Energy's refusal to perform according to the letter of intent justified Cinergy's refusal to pay the amounts due on the other contracts.

Following the filing of Stand Energy's claim for declaratory judgment and Cinergy's counterclaims, extensive discovery was had by both parties. When the

case came to trial in the Hamilton County Common Pleas Court, Judge Patrick T. Dinkelacker, during a ten-day period, heard testimony from eight witnesses and admitted over one hundred fifty items of evidence.

On March 23, 2000, Judge Dinkelacker journalized a detailed seventeen-page decision in which he made findings of fact and conclusions of law. In his well-reasoned and detailed decision, the judge found that Stand Energy had breached the one-hundred MW and the five MW contracts, despite its claim of *force majeure*, and that the letter of intent was not a binding and enforceable contract. On April 4, 2000, the judge journalized a judgment entry adopting his earlier findings and awarding damages.

## STAND ENERGY'S APPEAL

In five interrelated assignments of error, Stand Energy claims that the trial court erred in concluding that it had breached the one-hundred MW and the five MW contracts.

### The One-Hundred MW Contract and *Force Majeure*

The gravamen of Stand Energy's argument is that the trial court erred in rejecting its *force majeure* argument. A *force majeure* clause in a contract defines the scope of unforeseeable events that might excuse nonperformance by a party. See *United States v. Brooks–Callaway Co.* (1943), 318 U.S. 120, 63 S.Ct. 474, 87 L.Ed. 653. To use a *force majeure* clause as an excuse for nonperformance, the nonperforming party bears the burden of proving that the event was beyond the party's control and without its fault or negligence. See, *e.g.*, *Gulf Oil Corp. v. Fed. Energy Regulatory Comm.* (C.A.3, 1983), 706 F.2d 444; see, also, *N. Indiana Pub. Serv. Co. v. Carbon Cty. Coal Co.* (C.A.7, 1986), 799 F.2d 265.

*Force majeure* clauses are included in commercial contracts to provide flexibility in a volatile economy. Mistaken assumptions about future events or worsening economic conditions, however, do not qualify as a *force majeure*. "When a party assumes the risk of certain contingencies in entering a contract, * * * such contingencies cannot later constitute a 'force majeure.'" (Citations omitted.) *Dunaj v. Glassmeyer* (C.P.1990), 61 Ohio Misc.2d 493, 497, 580 N.E.2d 98, 101. The inability to purchase a commodity at an advantageous price is not a contingency beyond a party's control. If it were, fixed-price contracts, where the parties allocate the risk of price rises in a fluctuating market, would serve no purpose. See *N. Indiana Pub. Serv. Co. v. Carbon Cty. Coal Co.*, 799 F.2d at 275. A party cannot be excused from performance merely because performance may prove difficult, burdensome, or economically disadvantageous. See *State ex rel. Jewett v. Sayre* (1914), 91 Ohio St. 85, 109 N.E. 636; see, also, *Millers Cove Energy Co., Inc. v. Moore* (C.A.6, 1995), 62 F.3d 155.

■ Here, the evidence demonstrated that in June 1998, two of Stand Energy's "upstream" power suppliers could not meet their obligations to Stand Energy. A staff report of the Federal Energy Regulatory Commission revealed that, for the period of June and July 1998, unseasonably hot temperatures in the Midwest resulted in record demand for power and unprecedented high hourly prices for electric power.

Stand Energy was unable to deliver all of the power required under the one-hundred MW contract. On July 15, 1998, by filing this declaratory-judgment action, Stand Energy asserted that it was invoking the *force majeure* provisions of the contract to excuse its nonperformance. After July 22, 1998, Stand Energy delivered no power under the contract for the remainder of the year. Moreover, Stand Energy refused to pay Cinergy's costs to obtain replacement power.

At trial, Stand Energy's president testified that she had relied upon *force majeure* to preserve the economic vitality of the company, and to save the jobs of fifty employees. There was testimony that Stand Energy had been in a perilous financial situation: it was required to purchase power at high market prices and provide it to Cinergy at a low contract price.

■ Thus, there was competent, credible evidence to establish that Stand Energy had breached the one-hundred MW contract by not providing power to Cinergy in June and July and for the remainder of 1998. Based upon the evidence, the trial court could have concluded that Stand Energy's nonperformance was dictated by economic hardship and not by *force majeure*. An appellate court may not reverse a judgment of the trial court if it is supported by some competent, credible evidence going to all the essential elements of the case or defense. See *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614 N.E.2d 742; see, also, *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

In a case such as this, where the evidence is complex and often subject to more than one interpretation, we are guided by the principle that whether the case is "civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus; see, also, *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411, 461 N.E.2d 1273, 1276. Therefore, Stand Energy's first and fourth assignments of error are overruled.

■ In its fifth assignment of error, Stand Energy contends that the trial court improperly excluded evidence of Cinergy's conduct, during the summer of 1999, in invoking a *force majeure* provision in a separate contract with another party. Stand Energy intended to use the evidence to prove that in 1998 Cinergy

had other means of mitigating its damages by intentionally draining electric power from a transmission grid in violation of regulations governing the grid, as it claimed Cinergy did in 1999.

The admission or exclusion of evidence is generally committed to the sound discretion of the trial court. See *Wyant v. Marble* (1999), 135 Ohio App.3d 559, 563, 735 N.E.2d 9, 12; see, also, Evid.R. 402 and 403. As there was no factual nexus between Stand Energy's 1998 *force majeure* assertion and Cinergy's 1999 declaration, and as a party is not required to do what is unreasonable to mitigate damages, see *Parrish v. Machlan* (1997), 131 Ohio App.3d 291, 296, 722 N.E.2d 529, 532, the trial court's decision to exclude the evidence exhibited a sound reasoning process and was not arbitrary or unconscionable. See *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601. Stand Energy's fifth assignment of error is overruled.

### The Five MW Contract

Stand Energy contends that the trial court erred in concluding that it had breached the five MW contract when it failed to pay for power provided by Cinergy in June and July 1998. The trial court found that the five MW contract was valid and enforceable and that Stand Energy had not paid for the option calls in the summer of 1998, thus materially breaching the contract. In Stand Energy's view, its nonpayment under the five MW contract was justified by Cinergy's failure to pay under the one-hundred MW contract and by the following comment of Cinergy's counsel at the July 20, 1998 conference call: "You're not going to be seeing any money from us."

There was competent, credible evidence to support the trial court's conclusion that Stand Energy had breached the five MW contract. Stand Energy admitted not paying under the contract. Cinergy performed fully under the contract. Stand Energy's claimed justification for nonpayment failed, as Cinergy's failure to pay under the one-hundred MW was justified in light of Stand Energy's prior breach of the one-hundred MW contract by refusing to pay liquidated damages. Moreover, absent an agreement to "net" the accounts between the parties, Stand Energy could not withhold payment in an attempt to offset its damages on a different contract. See, *e.g., Columbia Gas Transm. Corp. v. Larry H. Wright, Inc.* (S.D.Ohio 1977), 443 F.Supp. 14, 21–22. Therefore, the second assignment of error is overruled. See *Myers v. Garson;* see, also, *C.E. Morris Co. v. Foley Constr. Co.* As the trial court's conclusions of law on the two breached contracts were not inconsistent, Stand Energy's third assignment of error is also overruled.

## CINERGY'S APPEAL

Cinergy raises two assignments of error in its cross-appeal. It asserts that the trial court's April 4, 2000 judgment entry must be modified to reflect a net award of damages in favor of Cinergy on the one-hundred MW contract. It further claims that the trial court erred in ruling that the letter of intent was not an enforceable contract.

### The Letter of Intent

We first address Cinergy's assertion that the trial court erred in concluding that the letter of intent was not enforceable. As the Supreme Court of Ohio has noted, "It is thus not the law that an agreement to make an agreement is *per se* unenforceable. The enforceability of such an agreement depends rather on whether the parties have manifested an intention to be bound by its terms and whether these intentions are sufficiently definite to be specifically enforced." *Normandy Place Assoc. v. Beyer* (1982), 2 Ohio St.3d 102, 105–106, 2 OBR 653, 656, 443 N.E.2d 161, 164. Cinergy argues that the detailed description of the terms of the proposed agreement, and of the obligations of the parties, in the signed letter of intent, particularly the provision that "Stand Energy shall sell power" and " * * *shall deliver to Cinergy * * * 200 MW * * *," reflected that the parties intended to be bound by the letter of intent.

The trial court undertook an analysis of the terms of the letter of intent. In its parsing, the trial court noted that, despite the reference to Stand Energy's obligation to provide power, the document referred to a "proposed agreement" with a "proposed date" of execution; noted that several terms awaited the creation of a more definite agreement; provided for an "offering period"; indicated that resolution of the rights of assignment awaited "any agreement reached pursuant to this letter of intent"; and stated, "This offer is also contingent on the following" additional conditions precedent.

The trial court's legal conclusion that the letter of intent did not manifest Stand Energy's intention to be bound by its terms is amply supported by competent, credible evidence. See *Normandy Place Assoc. v. Beyer*. At most, the letter of intent was evidence of the parties' intent to enter into a business relationship involving a two-hundred MW contract sometime in the future, after the purpose and terms of the agreement were memorialized in another writing. Unlike what happened with a similar letter of intent Cinergy had contemporaneously prepared with another party, no letter of confirmation was prepared and signed by Cinergy and Stand Energy.

Moreover, the trial court's finding that the four contingencies had not been fulfilled is supported by competent, credible evidence. Therefore, the letter of intent was not binding on the parties. See *O'Rear v. Unijax* (Apr. 3, 1991),

Hamilton App. No. C–900077, unreported, 1991 WL 45585; see, also, *Antonio Palazzolo Co. v. Sutherland Save–Way Materials Ctr.* (July 5, 1989), Hamilton App. No. C–880291, unreported, 1989 WL 72491. The letter of intent was not a legally enforceable contract. Therefore, Cinergy's second assignment of error is overruled.

### The Form of the Judgment

Cinergy also argues that the trial court erred in effectively entering two different judgments on the one-hundred MW contract, as opposed to a single, net judgment in favor of Cinergy. In its April 4, 2000 judgment entry, the court reiterated that it had ruled in Cinergy's favor on the one-hundred MW contract in the amount of $5.1 million, to be partially offset by the $1.2 million owed by Cinergy to Stand Energy. The entry, however, further stated:

"Accordingly, [Stand Energy] is entitled to recover from Cinergy the sum of $1,261,920.00 together with interest thereon * * *. Cinergy is entitled to recover from [Stand Energy] the sum of $5,133,365.70 [the 100-MW damages plus the 5 MW damages] together with interest thereon * * *."

Cinergy claims that this order of the court—providing two different judgments for execution—leaves it open to paying the judgment for Stand Energy in full and yet being unable to recover anything from Stand Energy on the separate liability.

Cinergy's claim is supported by law. "In a situation such as this where adverse claims are made relating to the same or related subject matter, the trial court may make findings in favor of either party but should render only one judgment and that in favor of the party having the greater amount due." *Southside Serv. Co., Inc. v. Monarch Steel Co.* (Apr. 2, 1992), Cuyahoga App. No. 60210, unreported, 1992 WL 67106, citing *Betz v. Timmons* (1963), 119 Ohio App. 239, 27 O.O.2d 138, 199 N.E.2d 22, and *Gordon v. Steinmetz* (1905), 71 Ohio St. 372, 73 N.E. 512. Therefore, the trial court must amend its judgment entry to reflect one net judgment in Cinergy's favor on the one-hundred MW contract, in addition to Cinergy's $32,858.72 judgment on the five MW contract. Cinergy's first assignment of error is sustained.

### CONCLUSION

Because competent, credible evidence supported the trial court's decision that Stand Energy had breached the one-hundred MW and the five MW contracts, despite its claim of *force majeure*, and that the letter of intent was not a binding and enforceable contract, we affirm the trial court's determination of liability. Because, however, the trial court erroneously failed in its judgment to provide one net award of damages, we must vacate the award of damages and remand

this cause for the entry of a damage award in accordance with the terms of this decision.

*Judgment accordingly.*

GORMAN, P.J., HILDEBRANDT and SHANNON, JJ., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.