Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/16/2019 09:07 AM CDT

ANDREW ALBRECHT, APPELLEE AND CROSS-APPELLANT,
v. KEVIN FETTIG, DOING BUSINESS AS FETTIG
CATTLE COMPANY, APPELLANT
AND CROSS-APPELLEE.

___ N.W.2d ___

Filed July 16, 2019.    No. A-18-445.

1. **Contracts: Appeal and Error.** The interpretation of a contract is a
   question of law, in connection with which an appellate court has an
   obligation to reach its conclusions independently of the determinations
   made by the court below.
2. **Judgments: Appeal and Error.** In a bench trial of a law action, the trial
   court's factual findings have the effect of a jury verdict and will not be
   disturbed on appeal unless clearly wrong.
3. **Trial: Witnesses.** In a bench trial of an action at law, the trial court is
   the sole judge of the witnesses' credibility and the weight to be given
   their testimony.
4. **Prejudgment Interest: Appeal and Error.** Whether prejudgment inter-
   est should be awarded is reviewed de novo on appeal.
5. **Uniform Commercial Code: Contracts.** Under the Uniform
   Commercial Code, a buyer is given the right to reject the whole if the
   goods fail in any respect to conform to the contract.
6. ____: ____. An output contract is one in which the actual quantity
   of goods subject to the sale or purchase is indefinite. The quantity is
   determined by either the output of the seller or the requirements of
   the buyer.
7. ____: ____. Nebraska's codification of the Uniform Commercial
   Code (particularly Neb. U.C.C. § 2-601 (Reissue 2001)) and Nebraska
   Supreme Court precedent make it clear that buyers may reject an entire
   delivery that in any way fails to conform to the contract.
8. **Prejudgment Interest: Appeal and Error.** Prejudgment interest may
   be awarded only as provided in Neb. Rev. Stat. § 45-103.02 (Reissue
   2016).

9. **Prejudgment Interest: Claims.** A claim is liquidated for purposes of prejudgment interest when there is no reasonable controversy as to both the amount due and the plaintiff's right to recover.

Appeal from the District Court for Thurston County: Jᴏʜɴ E. Sᴀᴍsᴏɴ, Judge. Affirmed.

David A. Domina, of Domina Law Group, P.C., L.L.O., and Stuart B. Mills for appellant.

Wendy J. Ridder, of Law Offices of Daniel P. Bracht, P.C., L.L.O., for appellee.

Pɪʀᴛʟᴇ, Aʀᴛᴇʀʙᴜʀɴ, and Wᴇʟᴄʜ, Judges.

Aʀᴛᴇʀʙᴜʀɴ, Judge.

## INTRODUCTION

Kevin Fettig appeals from an order of the district court for Thurston County that ordered him to return a $6,000 deposit to Andrew Albrecht from an uncompleted cattle sale and awarded Albrecht incidental damages of $449.53, both of which carried a 3.61-percent postjudgment interest rate. The court initially ordered Fettig to pay prejudgment interest at a rate of 12 percent on the $6,000 deposit but subsequently granted Fettig's motion to alter or amend, thereby ordering that no prejudgment interest was owed on the deposit. Albrecht cross-appeals from the order granting Fettig's motion to alter or amend. For the reasons that follow, we affirm the district court's award of damages to Albrecht totaling $6,449.53 and the district court's amended order that eliminated the award of prejudgment interest on the $6,000 award.

## BACKGROUND

Albrecht operates a cow-calf ranch in Thurston County, Nebraska, breeding and selling primarily Red Angus cattle. Although he performs some work individually, Albrecht also does some work through a business that involves his brother and father. That business holds an annual sale in April wherein it primarily sells Red Angus bulls. Albrecht's individual

operation involves feeding cattle in his own feedlot and then selling them for slaughter. He prefers to feed primarily Red Angus cattle based on what he believes to be their superior performance and for the reason that prospective customers for the annual bull sale stop at his feedlots to view the cattle. He noted that buyers are more likely to bid at the annual bull sale when they have seen Red Angus cattle on the Albrecht family feedlots. Additionally, Albrecht is a member of the Red Angus Association.

Albrecht attributed his preference for Red Angus cattle to the cattle's superior performance. In comparison to black-hided cattle, Albrecht's father described Red Angus cattle as being more docile and more heat tolerant during the summertime. Steers that tolerate heat better are less likely to unexpectedly die. Albrecht's brother also observed Red Angus steers' better heat tolerance and docile temperament, noting that they are less likely to run in their pens and kick up dust, which can cause illness. Albrecht's brother stated that he had paid more for red cattle than black cattle based on their coloration. He also noted that Red Angus steers can garner a higher price in the region due to years of ranchers' culling red-hided cattle from their herds, which led to their scarcity as compared to black-hided cattle.

Fettig works as a rancher and cattle buyer, whereby he purchases cattle and resells them to buyers, including Albrecht. Albrecht bought cattle through Fettig when his normal cattle buyer was unavailable in May 2015. Although Albrecht wanted mostly red-hided steers, Fettig purchased mostly black-hided steers for Albrecht. Albrecht testified that Fettig apologized for "sending [him] the wrong color of cattle" following a prior transaction. Despite the cattle not meeting Albrecht's specifications, Albrecht told Fettig that he would accept that particular shipment of cattle but would reject any future deliveries of the wrong color of cattle.

A few months later, in July 2015, Albrecht again retained Fettig to purchase cattle for him. Albrecht testified that they

discussed Albrecht's desire to buy around 150 head of primarily red-hided cattle, and Fettig told Albrecht that there might be 5 head of black-hided cattle in the order. Fettig prepared a contract for the sale, which described that the cattle would be 80 percent red hided and 20 percent black hided. Fettig testified that he did not make statements indicating that there would be less than 20 percent black-hided cattle. However, Albrecht said that the contract varied from their initial conversation and that he called Fettig to discuss the description of cattle as 80 percent red hided and 20 percent black hided. According to Albrecht, Fettig said that he included the percentages only to "cover his bas[e]s" but that he nonetheless intended for there to be only a few black-hided steers in the delivery.

The contract for the purchase of livestock is dated July 15, 2015, and signed by both parties. A number of terms are handwritten, including the quantity of steers, their description, and the price. Albrecht and Fettig both testified that all the handwritten terms on the contract were written by Fettig. The quantity is given as "APPROX 150 - HD," which both parties understood to mean approximately 150 head of cattle. Albrecht testified that he understood he could receive some deviation from 150 head of cattle, such as receiving 151 head of cattle. The contract describes the cattle to be delivered as "80% Red Angus cross [and] 20% Bl[ac]k Angus cross steers" at a base average weight of 780 pounds. The price is given as $235 per hundredweight. Additionally, a sliding price scale was provided whereby the price could be adjusted up to $0.15 per pound if the average weight of the steers was higher or lower than the 780-pound base weight stated in the contract. The contract memorialized a "country deal" according to the parties, which is signed with an understanding that delivery will occur at a date in the future. In this case, as in many such deals, the buyer did not view the cattle prior to signing the contract. Here, the contract specified a delivery window of between October 10 and 25, 2015. As part of the negotiation,

Fettig informed Albrecht of the ranch from which he would be buying the steers in North Dakota, which included a discussion of the owner and the Red Angus bulls the owner utilized for the cattle he raised and sold. Fettig and the owner, Randy Kahl, executed a contract for the sale of the steers to Fettig, which in turn were sold to Albrecht.

The parties spoke by telephone on a number of occasions in early October 2015, prior to the delivery of the steers. During one of these conversations, Fettig indicated that there were 10 additional head of cattle that were ready for delivery if Albrecht was interested. Albrecht confirmed that he was interested in purchasing the 10 additional head and negotiated a price for them of $189 per hundredweight because prices in the cattle market had gone down since they signed the original contract in July. Albrecht testified that the additional 10 head of cattle fell outside the "approximately" term of their original contract. However, Fettig testified that he asked Albrecht about the 10 additional head of cattle and negotiated a new price as a "courtesy," even though he believed that he could have included them under the "approximately" term of the original contract.

The cattle were delivered to Albrecht late at night on October 14, 2015, after it was dark outside. The next morning, Albrecht saw the cattle in the daylight and observed that there were a lot of black-hided steers: "I knew there was more than 20 percent without even counting them . . . ." Albrecht also observed a few "butterscotch" steers, which he believed to have Charolais genetics. In preparation for trial, Albrecht counted the steers from a video he took and found 88 red steers, 68 black steers, and 4 butterscotch steers.

Albrecht called Fettig on October 15, 2015, and expressed frustration and displeasure at receiving so many black steers. Fettig offered to take back the black steers, leaving Albrecht with 88 head of red steers, but Albrecht rejected that offer. Albrecht testified that Fettig's offer was unsatisfactory to him because it would leave him with a partial pen of cattle, which

would result in a higher cost of feeding each cow given that the labor required to feed a partial pen of cattle is no different than is needed to feed a full pen. According to Albrecht, Fettig never offered to bring more red cattle.

After discussing the mix of cattle delivered with his brother, father, and an attorney, Albrecht called Fettig on October 16, 2015, and rejected the delivery based on the inclusion of too many black steers. Albrecht also noted that the contract did not allow for the delivery of any butterscotch steers. Albrecht testified that Fettig made no offers after he rejected the delivery on October 16. Despite having until October 25 to cure the problem, Fettig admitted that he made no efforts to find more red cattle to meet the 80-percent threshold after Albrecht's rejection on October 16. Fettig testified that he did not work to find additional red steers "[b]ecause the door was slammed on me to take them all back and he refused them." Kahl testified that he informed Fettig that he had more red steers available, which could have been swapped for black steers. He did note that the additional red steers would weigh less than the 780-pound average called for in the contract but that the slide could be applied.

Fettig sent trucks to pick up all the steers on October 17, 2015, and return them to North Dakota. Between the time the cattle were delivered to Albrecht on October 14 and when the cattle were picked up on October 17, Albrecht said he fed them as he would feed his own cattle—giving them hay, silage, corn, and "modified distillers." Albrecht testified that he told Fettig he was feeding the cattle and discussed whether Fettig wanted them fed before being loaded onto trucks for the return trip to North Dakota. However, Fettig testified that he did not recall Albrecht discussing feeding the cattle but acknowledged that Albrecht discussed administering an antibiotic mix to the cattle.

Before loading the cattle for their return trip, Albrecht asked that Fettig refund the $6,000 deposit he paid. Fettig agreed and (at Albrecht's insistence) drafted a written agreement reflecting

the repayment promise pursuant to Albrecht's request. Fettig emailed that agreement to Albrecht, which also included a provision requiring Fettig to pay the trucking bill from North Dakota to Nebraska. The agreement was dated October 17, 2015. Although Fettig testified that Albrecht made no threats to coerce him to sign the repayment agreement, he also stated that Albrecht was "forcing [his] hand" because Albrecht stated he would not load the cattle until Fettig signed the repayment agreement. Albrecht testified that he made no threats of any kind to induce Fettig to sign the repayment agreement. He simply wanted their verbal agreement in writing because he "didn't trust [Fettig] at that point anymore." Fettig signed the repayment agreement, and Albrecht loaded the cattle for the return trip to North Dakota. Fettig admitted that he never returned Albrecht's $6,000 deposit. Fettig testified that he had the steers transported back to a feedlot in North Dakota. He maintained ownership of the cattle, paying for them to be fed. He ultimately sold the cattle at a sale barn at a price below the price contracted for with Albrecht.

Between October 17 and 25, 2015—the close of the performance period provided in their purchase agreement—Fettig and Albrecht had no contact. On November 9, Albrecht text messaged Fettig to inquire about the $6,000 deposit refund. Fettig replied and told Albrecht that he had filed a lawsuit against Albrecht and that his attorney instructed him not to discuss the matter.

Albrecht then filed a complaint in the county court for Thurston County on November 11, 2015, alleging that Fettig breached their written purchase agreement that was dated July 15, 2015. Albrecht alleged that he was damaged in the amount of the $6,000 deposit he paid to Fettig, the yardage and feed costs incurred by housing the cattle from October 14 to 17, transportation costs, and the labor and miscellaneous costs associated with loading the cattle for their return trip.

On December 14, 2015, Fettig filed an answer and counterclaim. Fettig's counterclaim alleged that Albrecht breached

their written purchase agreement that was dated July 15, 2015, by refusing to accept delivery of cattle that complied with their agreement. Fettig requested that the court award to him damages in the amount of the value lost on the cattle between their delivery to Albrecht and their eventual sale on December 5, 2015, along with associated costs and expenses he incurred.

The matter was subsequently transferred to district court on July 28, 2016. Fettig filed an amended answer and counterclaim on September 14, which more specifically set forth damages. Trial on the matter occurred on November 28 and December 13, 2017. Albrecht testified and offered the testimony of four other witnesses. Fettig also testified but called no other witnesses. He did offer the deposition testimony of Kahl, which was received. Numerous exhibits were admitted.

Following trial, the court entered its order on February 7, 2018. Specifically, the court noted that "Albrecht was a very credible witness and that his testimony regarding the conversations and dealings between he and . . . Fettig was believable and persuasive." The court found that Albrecht had never accepted delivery of the cattle and verbally notified Fettig of the issue regarding the cattle's coloration on October 15, 2015, after Albrecht saw the cattle in the daylight for the first time. On October 16, Albrecht officially rejected the cattle. The court found Albrecht's testimony credible that Fettig's only offer to cure was his offer to remove all the black-hided steers, which would leave Albrecht with significantly fewer than the approximately 150 head of cattle called for in the purchase agreement. The court found that Fettig made no other attempts to cure the delivery before the final performance date of October 25, 2015, and that if the only action taken by Fettig was to take back the black cattle, he would still have breached the contract's requirements as to the number of cattle delivered.

The court held that the parties' agreement did not limit Albrecht's right to reject the cattle. Instead, the provision that

unmerchantable cattle—those exhibiting disease and deformities—could be rejected was a nonexclusive ground on which Albrecht could reject the cattle delivery. Moreover, the court held that Albrecht was entitled under Nebraska's Uniform Commercial Code (U.C.C.) to reject the entire delivery, accept the entire delivery, or accept any portion of the delivery and reject the rest. Albrecht's rejection of the entire cattle delivery was therefore allowed under the U.C.C. Finally, the court found that Fettig had not met his burden of proof regarding his counterclaim and therefore dismissed the counterclaim.

The court awarded damages to Albrecht based on Fettig's breach. The court ordered Fettig to refund Albrecht's $6,000 deposit. The court ordered Fettig to pay 12 percent prejudgment interest on the $6,000 deposit from October 17, 2015, and 12 percent postjudgment interest. The court also ordered Fettig to pay incidental damages based on the costs Albrecht incurred in caring for the cattle on his property from October 14 through 17, totaling $449.53, and attached postjudgment interest at the rate of 3.61 percent until paid in full. The court found that Albrecht did not meet his burden of proof as to establishing the amount of the trucking bill, so it awarded no damages related to trucking expense.

Fettig filed a motion to alter or amend on February 15, 2018, arguing that prejudgment interest was inappropriate and that a postjudgment interest rate of 12 percent was also inappropriate. A brief hearing was held on April 11, 2018. In ruling from the bench, the court's rationale centered on Albrecht's failure to plead prejudgment interest. On April 13, the court amended its order to reflect a 3.61-percent postjudgment interest rate as to the $6,000 judgment for the deposit and eliminated any prejudgment interest award.

Fettig now appeals, and Albrecht cross-appeals.

ASSIGNMENTS OF ERROR

Fettig assigns, restated, that the district court erred in finding that Albrecht could reject the cattle for failing to consist of

approximately "80% red-hided and 20% black-hided steers," that Fettig had failed to notify Albrecht of his intention to cure the purported breach, and that Albrecht repudiated the contract before the performance period closed.

Albrecht assigns that the district court erred in vacating its award of 12 percent prejudgment interest on the $6,000 deposit owing to Albrecht from October 17, 2015.

## STANDARD OF REVIEW

[1-3] The interpretation of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below. *Omaha Police Union Local 101 v. City of Omaha*, 292 Neb. 381, 872 N.W.2d 765 (2015). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Bloedorn Lumber Co. v. Nielson*, 300 Neb. 722, 915 N.W.2d 786 (2018). In a bench trial of an action at law, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Stauffer v. Benson*, 288 Neb. 683, 850 N.W.2d 759 (2014).

[4] Whether prejudgment interest should be awarded is reviewed de novo on appeal. *Roskop Dairy v. GEA Farm Tech.*, 292 Neb. 148, 871 N.W.2d 776 (2015).

## ANALYSIS

The U.C.C. applies to transactions in goods. Neb. U.C.C. § 2-102 (Reissue 2001). The U.C.C. defines the term "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action." Neb. U.C.C. § 2-105 (Reissue 2001). This matter involves a sale of cattle, which are movable at the time of identification in the parties' purchase agreement. Thus, the U.C.C. governs this matter.

*Albrecht's Rejection of*
*Fettig's Delivery.*

Fettig argues on appeal that the written purchase agreement exclusively limited Albrecht's right of rejection to unmerchantable cattle—those that are diseased, crippled, or deformed. He argues that Albrecht could not reject the cattle for failing to be a "'perfect-tender'" under the terms of their purchase agreement. Brief for appellant at 18. Fettig also argues that their purchase agreement was an "output contract" and did not call for delivery of exactly 80 percent red-hided steers and 20 percent black-hided steers. *Id.* at 30. For the reasons that follow, we agree with the district court that Albrecht could reject Fettig's delivery because the steers he delivered were not 80 percent red hided and 20 percent black hided.

An agreement between parties may provide remedies in addition to, or in substitution for, those remedies provided in article 2 of the U.C.C. Neb. U.C.C. § 2-719(1)(a) (Reissue 2001). Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy. § 2-719(1)(b). Section 2-719(1)(b) creates a presumption that contract clauses prescribing remedies are cumulative rather than exclusive. § 2-719, comment 2. If the parties intend that the contract term describes the sole remedy under the contract, this must be clearly expressed. *Id*.

[5] Where goods or the tender of delivery fail in any respect to conform to the contract, the buyer may reject the whole, accept the whole, or accept "any commercial . . . units and reject the rest." Neb. U.C.C. § 2-601 (Reissue 2001). Under the U.C.C., a buyer is given the right to reject the whole if the goods fail in any respect to conform to the contract. *Maas v. Scoboda*, 188 Neb. 189, 195 N.W.2d 491 (1972).

[6] An output contract is one in which the actual quantity of goods subject to the sale or purchase is indefinite. *Meyer v. Sandhills Beef, Inc.*, 211 Neb. 388, 318 N.W.2d 863 (1982). The quantity is determined by either the output

of the seller or the requirements of the buyer. *Id*. A lawful output contract imposes an obligation upon the seller to use best efforts to supply the goods and upon the buyer to use best efforts to promote their sale. See Neb. U.C.C. § 2-306(2) (Reissue 2001).

In the present case, the parties' purchase agreement provides that Albrecht, as the buyer, may reject any cattle that are not in a merchantable condition. However, the agreement does not describe this remedy as the sole remedy under the contract. In the absence of such clear expression of exclusivity, a remedy is presumed cumulative—not exclusive—under § 2-719(1)(b). Nevertheless, Fettig contends that the Latin phrase "expressio unius est exclusio alterius," which means "the expression of one thing is the exclusion of the other," ought to be applied here to show that Albrecht was limited under their agreement to rejecting the delivery only if the cattle were unmerchantable. Brief for appellant at 15. Our codified adoption of the U.C.C. supplants general principles of interpretation, and we will adhere to the presumption that remedies are cumulative unless exclusivity is clearly expressed. Therefore, like the district court, we will not read into the contract the addition of terms that do not appear, and thus, we find that Albrecht was entitled to reject the cattle delivered for reasons beyond their merchantable condition.

The contract that Fettig drafted specified that he was to provide to Albrecht approximately 150 head of cattle that were 80 percent red hided and 20 percent black hided. They subsequently negotiated the sale of an additional 10 head of cattle. Fettig delivered 88 red steers, 68 black steers, and 4 butterscotch steers. That amounted to 160 head of cattle that were 55 percent red hided, 42.5 percent black hided, and 2.5 percent butterscotch hided. Thus, the cattle delivered did not conform to the terms of the contract, entitling Albrecht to reject the entire delivery, accept the entire delivery, or accept "any commercial . . . units and reject the rest." See § 2-601. Albrecht elected to reject the entire delivery.

[7] Fettig argues that the so-called perfect tender rule has eroded over time and only stands for the proposition that buyers may reject a substantially nonconforming delivery. Nebraska's codification of the U.C.C. (particularly § 2-601) and our Supreme Court precedent make it clear that buyers may reject an entire delivery that in any way fails to conform to the contract. See, e.g., *Maas v. Scoboda, supra*. Even if we accepted Fettig's position as correct, which we decline to do, it is unreasonable to suggest that the delivery in this case substantially conformed to the contract. The contract specified that Fettig was to deliver cattle that were 80 percent red hided and 20 percent black hided, but Fettig instead delivered cattle that were 55 percent red hided and 42.5 percent black hided. Fettig's delivery was much more than a slight deviation from the terms of the contract.

At trial, Fettig and Kahl testified that there would be no difference in the price paid for cattle, whether red hided or black hided. They testified that the key provision in a "country deal" was the weight and that cattle feeders are not concerned about hide color. Based on this testimony, Fettig essentially argues that the color of the steer delivered is of no consequence so long as the underlying genetics and weight meet the contract's requirements. Albrecht testified that color was a critical factor in his decision to enter the contract and noted his insistence to Fettig that the cattle delivered be, at minimum, 80 percent red hided. Moreover, he testified to his dissatisfaction with a past shipment of cattle that did not conform to the description provided by Fettig. While Fettig and Kahl may have disagreed that color of the cattle was important, the evidence demonstrated that Fettig agreed to deliver what Albrecht demanded but failed to deliver on his promise.

Fettig also urges us to decide that the contract term "approximately" ought to be applied to both the quantity and the proportion of red-hided to black-hided steers. The plain language of the contract demonstrates that "approximately" only attached to the quantity. Nevertheless, even if we again

accept Fettig's proposition that he was required to deliver *approximately* 80 percent red-hided steers and *approximately* 20 percent black-hided steers, his delivery does not conform to that fictional iteration of the contract. We cannot find that a delivery of 55 percent red-hided steers satisfies the requirement of delivering approximately 80 percent red-hided steers, nor that a delivery of 42.5 percent black-hided steers satisfies the requirement of delivering approximately 20 percent black-hided steers. Fettig's delivery did not comply with the contract, and Albrecht was therefore entitled to reject the entire delivery.

Lastly, Fettig argues that the contract here was an output contract, which necessitated that both parties deal in good faith. Notwithstanding Fettig's admission that he did not attempt to load steers for delivery that were 80 percent red hided and 20 percent black hided, we find no indication that either party dealt in bad faith. However, we also find that the contract here was not an output contract. Albrecht agreed to buy a set number of steers that also met weight and hide-color requirements. The inclusion of the term "approximately" does not negate the defined nature of the parties' contract. The parties did not sign an output contract because Albrecht did not agree to buy, for example, all the red-hided steers that Fettig could secure or all the steers that weighed 780 pounds. The contract's quantity was a definite, albeit approximate, term and unlike those found in output contracts.

Based on the foregoing, we agree with the district court that Albrecht was entitled to reject the cattle delivery because it did not include 80 percent red-hided and 20 percent black-hided steers. Albrecht's right to reject on this ground existed notwithstanding the contract's additional ground for rejection if the cattle were unmerchantable.

*Fettig's Purported Cure.*

Fettig argues on appeal that he notified Albrecht of his intention to cure the nonconforming delivery by offering to

pick up the black-hided steers. We agree with the district court that Fettig's purported offer to cure would have actually resulted in another material breach of the contract. Thus, we affirm the district court's finding that Fettig failed to timely notify Albrecht of his intention to appropriately cure the breach.

Where any tender or delivery by the seller is rejected because nonconforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery. Neb. U.C.C. § 2-508(1) (Reissue 2001).

Albrecht and Fettig agree that the contract required performance before October 25, 2015. The parties also agree that Albrecht rejected Fettig's delivery of the cattle on October 16, meaning that Fettig had from October 16 until October 25 to notify Albrecht of his intention to cure and then make a conforming delivery. Fettig argues that he did attempt to cure because he "offered to pick up the black cattle . . . Albrecht did not want." Brief for appellant at 31. Fettig also argues that Albrecht did not request the delivery of additional red steers.

The very nature of curing a nonconforming delivery is to make a conforming delivery. As the district court noted in its order, if Fettig had taken back all the black cattle, then the resulting delivery would not conform to the required quantity of cattle to be delivered. Even if Fettig took back some but not all of the black cattle, then the 80-20 proportion may be achieved, but the quantity requirement would remain unmet. Aside from Fettig's offer to take back the black cattle, he made no other potential offers to cure. We note that, between the cattle returning to North Dakota on October 17 and the performance period's conclusion on October 25, the parties had no contact. We also note that Fettig admitted to not attempting to secure additional red-hided steers despite Kahl's offer to provide him with additional red steers.

We agree with the district court that Fettig never timely notified Albrecht that he intended to appropriately cure the breach as Fettig's purported offer to cure would have actually resulted in other breaches. Therefore, we affirm the district court's finding that Fettig failed to notify Albrecht of his intention to cure the nonconforming tender.

*Albrecht's Purported Repudiation.*

Fettig's final argument on appeal is that the district court erred by failing to find that Albrecht repudiated the contract prior to the time allowed for Fettig to perform his contractual obligations. Specifically, Fettig argues that Albrecht repudiated the contract because he "told . . . Fettig to take back all the cattle — and not just bring some reds and take back some blacks." Brief for appellant at 35. The district court in essence found that Albrecht did not repudiate the contract by rejecting the entirety of the nonconforming delivery as was his right under § 2-601 by finding that Fettig retained the ability to cure the breach. The evidence supports the district court's finding. Although the parties did have some discussion regarding a cure, the only action offered by Fettig was to pick up some or all of the black steers. After Albrecht rejected this offer and rejected the delivery, Fettig was still free to attempt to fulfill the provisions of the contract. Instead, he arranged for removal of all of the cattle and prepared a second contract that provided for how the parties would accomplish the return. His own testimony demonstrates no postrejection efforts to meet the terms of the original contract. Thus, we cannot say the district court erred by failing to conclude that Albrecht repudiated the parties' contract before the performance period concluded.

*Albrecht's Claim for*
*Prejudgment Interest.*

We now turn to Albrecht's cross-appeal. Albrecht alleges that the district court erred in vacating its February 7, 2018,

order, which awarded prejudgment interest at a rate of 12 percent on the $6,000 damage award. During the hearing on Fettig's motion to alter or amend, the district court found that there was no specific request in Albrecht's complaint for prejudgment interest. The court found that the request found in Albrecht's complaint for "such other and further relief as the Court deems just and equitable" did not sufficiently plead a request for prejudgment interest in order for a recovery to be made. The court noted its opinion that prejudgment interest is not equitable in nature. Although our rationale varies somewhat from that utilized by the district court, we agree with the court's conclusion.

[8,9] Prejudgment interest may be awarded only as provided in Neb. Rev. Stat. § 45-103.02 (Reissue 2010). *Roskop Dairy v. GEA Farm Tech.*, 292 Neb. 148, 871 N.W.2d 776 (2015). Subsection (2) of § 45-103.02 provides that interest shall accrue on the unpaid balance of liquidated claims from the date the cause of action arose until the entry of judgment. A claim is liquidated for purposes of prejudgment interest when there is no reasonable controversy as to both the amount due and the plaintiff's right to recover. *Roskop Dairy v. GEA Farm Tech., supra*. Interest shall be allowed at the rate of 12 percent per annum on money due on any instrument in writing. Neb. Rev. Stat. § 45-104 (Reissue 2010). For purposes of our analysis, we assume without deciding that Albrecht's claim is liquidated.

Albrecht argues that his claim was liquidated and that his request for "further relief as the Court deems just and equitable" was sufficient to put Fettig on notice that prejudgment interest could be awarded. He urges us to adopt a rule that prejudgment interest be ordinarily granted unless exceptional or unusual circumstances make the award inequitable. See *J.C. Brager Co., Inc. v. Chesen*, 999 F. Supp. 675 (D. Neb. 1998). However, our review of the pertinent case law and rules of pleading lead us to a different conclusion.

The most recent case in Nebraska to address this issue is *Life Investors Ins. Co. v. Citizens Nat. Bank*, 223 Neb. 663, 392 N.W.2d 771 (1986). In that case, the Nebraska Supreme Court held that if a party does not pray for prejudgment interest, none can be provided. The basis for the Supreme Court's opinion was Neb. Rev. Stat. § 25-804 (Reissue 1985), which was repealed in 2002. That statute provided in part that special damages be stated in a petition "and if interest thereon be claimed, the time from which interest is to be computed shall also be stated." We note that not only has § 25-804 been repealed, but the decision made in *Life Investors Ins. Co.* predates the adoption of § 45-103.02(2). Therefore, we must analyze the interplay between § 45-103.02(2) with the court rule which has replaced § 25-804.

In 2002, the Legislature repealed Neb. Rev. Stat. § 25-801 through § 25-823 (Reissue 1995), which statutes related to pleadings, and adopted Neb. Rev. Stat. § 25-801.01 (Reissue 2016), which empowered the Supreme Court to adopt rules of pleading in civil actions "which are not in conflict with the statutes governing such matters." Pursuant to § 25-801.01, the Supreme Court promulgated the Nebraska Court Rules of Pleading in Civil Cases. Pertinent to this case is Neb. Ct. R. Pldg. § 6-1108(a), which provides, in part, "If the recovery of money be demanded, the amount of special damages shall be stated . . . ; and if interest thereon be claimed, the time from which interest is to be computed shall also be stated." We note that the language of the rule as it relates to interest is identical to the language that previously existed in § 25-804. Therefore, absent a distinguishing factor, it would appear that we would be required to follow the holding of *Life Investors Ins. Co., supra*, and find that since Albrecht did not state a time from which interest should be computed in his prayer for relief, his request for prejudgment interest must fail.

This leads us back to our analysis of § 45-103.02(2), which provides that prejudgment interest "*shall accrue* on the unpaid balance of liquidated claims from the date the cause

of action arose until the entry of judgment." (Emphasis supplied.) This provision was adopted after *Life Investors Ins. Co.* was decided but before the adoption of Neb. Ct. R. Pldg. § 6-1108(a). We recognize that a tension appears to exist between the statute and the court rule, but we do not believe that this tension is irreconcilable. Section 45-103.02(2) clearly sets out the availability of prejudgment interest. However, the court rule (adopted as part of the introduction of notice pleading to Nebraska) is concerned with litigants having adequate notice of the relief a plaintiff is seeking to obtain. Therefore, although the rule does place a procedural condition on a plaintiff's ability to recover prejudgment interest, it does not negate a plaintiff's ability to recover. Moreover, the rule secures a defendant's ability to have notice of the entire scope of the relief requested and prepare defenses thereto. Therefore, for the foregoing reasons, we affirm the decision of the district court to deny prejudgment interest to Albrecht.

## CONCLUSION

We therefore affirm the district court's order awarding to Albrecht a refund of his $6,000 deposit, incidental damages amounting to the cost of caring for the cattle between delivery and return, and court costs. We also affirm the district court's order denying prejudgment interest on the $6,000 judgment for return of the deposit.

Affirmed.